**UNITED STATES of America**

v.

**Clarence E. JONES, Appellant.**

**Nos. 71–1691, 72–1284.**

United States Court of Appeals, District of Columbia Circuit.

Argued Nov. 2, 1972.

Decided March 15, 1973.

Roger A. Clark, New York City (appointed by this Court) for appellant. William C. Potter, Jr., Washington, D. C., and David T. Bryant (both appointed by this Court) entered appearances for appellant.

Paul L. Friedman, Asst. U. S. Atty., with whom Harold H. Titus, Jr., U. S. Atty., John A. Terry, Herbert B. Hoffman and Kenneth M. Robinson, Asst. U. S. Attys., were on the brief, for appellee.

Before TAMM and LEVENTHAL, Circuit Judges, and CHARLES E. WYZANSKI, Jr.,* Senior United States District Judge for the District of Massachusetts.

TAMM, Circuit Judge:

Appellant, Clarence E. Jones, was convicted in the United States District Court for the District of Columbia of a violation of D.C.Code § 22–2801 (1967),[1] carnal knowledge of a female child under sixteen years of age. He was sentenced to imprisonment for a pe-

---

* Sitting by designation pursuant to 28 U.S. C. § 294(d) (1970).

1. D.C.Code § 22–2801 (1967) provides in pertinent part:

 Whoever has carnal knowledge of a female forcibly and against her will, or carnally knows and abuses a female child under sixteen years of age, shall be imprisoned for not more than thirty years . . . .

riod of not less than five nor more than twenty years, and his appeal from that conviction was brought to this court in No. 71–1691. Appellant additionally filed a Motion to Vacate Sentence pursuant to 28 U.S.C. § 2255 (1970), which motion was ultimately denied following a hearing. The appeal from that determination was brought to this court in No. 72–1284. The two appeals were consolidated for purposes of argument and decision, and as to both we affirm the disposition of the district court.

## FACTS

The testimony of various witnesses at the trial developed the facts essentially as follows. At 4:15 p. m. on Tuesday, November 3, 1970, fifteen year old Jancelyn Peagues was walking home from her modern dance class following a day of school. A late model, grayish blue Continental automobile with a dent in the door on the passenger's side pulled alongside. The driver, who was alone in the car at the time, asked Jancelyn if he "didn't . . . know [her] from some place." Jancelyn looked toward the driver, replied that she did not, and continued walking. When she reached the corner of Iowa Avenue and Buchanan Street she glanced back, saw that the car was double parked in the street, and resumed walking. Suddenly, someone came up from behind, grabbed her, poked something sharp into her side, and told her to come with him or be shot.

Jancelyn was forced into a nearby alley where the two walked "side by side" for a few minutes and she was able to get a good look at her assailant's face. She was led into a deserted garage and, ultimately, raped. Jancelyn testified that a few minutes after her assailant forcibly attained penetration "he stopped and got up, and he asked me wasn't I going to let him finish what he was doing, and I told him no. Then he started mumbling something and he fixed his clothes and just left." She then adjusted her clothes, double checked to be sure her assailant had left, and

went home. The entire incident took nearly forty minutes. Jancelyn testified at trial that she was able to look at her assailant's face during at least thirty minutes of this time.

Only Jancelyn's father and brother were at home when she arrived and, afraid and ashamed to tell them what occurred, she went directly to her room and took a bath, not reappearing until dinner. At dinner she said nothing of what had happened, ate very little, and was very quiet. Her mother, who had returned from work and was present at dinner, testified that she knew Jancelyn was in her menstrual period at the time and not feeling well. Following dinner Jancelyn returned to her room and watched television until about ten o'clock when her twenty-two year old sister, Sonia, returned home from work. Sonia testified that she found Jancelyn very upset, sitting on the side of her bed and crying, and it was at that time, some six hours following the rape, that Jancelyn first told anyone of the incident. Sonia immediately took Jancelyn to her mother. Mrs. Peagues asked her daughter, "Jancelyn, why didn't you tell me?" to which Jancelyn replied "Oh, mama, I was afraid," and continued crying. Mrs. Peagues contacted her husband and upon his immediate return home from work they took Jancelyn to D. C. General Hospital.

At 4:00 a. m., prior to her physical checkup, Jancelyn spoke to Detective Griffith of the Metropolitan Police Sex Squad. The detective recalled that Jancelyn "was upset and crying" while she reported to him the events of the preceding afternoon. Jancelyn described her assailant as having worn a maroon jacket and brown pants, as a Negro male, approximately twenty-one years of age, about six feet one or two inches in height, with a medium build and brown skin complexion. She also described in detail the scene of the rape.

The examining doctor testified at trial that he examined Jancelyn at 5:55 a. m. on the same morning. The examination revealed laceration in the hymen and the

presence of blood in the vagina and at the cervix. The doctor testified that the examination was consistent with penetration within the last twenty-four hours, although no intact sperm was discovered. The doctor additionally testified that the blood could have come either from the laceration or menstruation, but that he was unable to tell which.

Later in the morning of November 4 Jancelyn accompanied a detective to the scene of the rape and photographs were taken of the inside of the garage. The pictures, which were introduced as evidence at trial, depicted the scene precisely as Jancelyn had described it to Detective Griffith at the hospital.

On November 7 Jancelyn went to police headquarters to look at photographs. She looked at five books, each of which contained sixty to seventy-five color polaroid photographs of Negro males between eighteen and twenty-seven years of age. She stopped when she arrived at the picture of appellant, let out a scream, and started crying. The detective present testified that she pointed to the picture and stated "That's the man who raped me." At trial Jancelyn once more looked through the book containing appellant's photograph and again selected appellant's picture. The photograph was subsequently submitted to the jury for its consideration.

On November 10 the appellant was arrested at his parent's home at 822 Shepherd Street, Northwest, six and one-half blocks from the location of the rape. A four-door bluish gray Continental parked across the street caught the attention of one of the arresting officers —it contained a dent in the right front and generally[2] matched the description given by Jancelyn to the police—and further checks showed that the car was registered to Ann Thompson, appellant's girl friend. Jancelyn testified at trial

that photographs taken by the police depicted the car she saw her assailant driving on the day of the rape.

On November 24 Jancelyn returned to police headquarters for the purpose of viewing a lineup. She positively identified the appellant from the ten men in the line.

At trial the appellant did not testify in his own behalf, did not controvert to a substantial degree any of the above, but presented an alibi defense on the basis of testimony of his girl friend and assorted relatives. The jury returned a verdict of guilty and appellant was sentenced on August 9, 1971, to imprisonment for five to twenty years, with a recommendation that he be incarcerated in an institution where he could receive psychiatric treatment.

### No. 71–1691

In his appeal from the guilty verdict appellant raises two specific issues that merit discussion: (1) Did the trial court err in refusing to enter a judgment of acquittal because complainant's testimony was without independent corroboration? (2) Did the court err in permitting in the jury's presence the use of a book of photographs maintained by the Metropolitan Police Sex Squad, and in admitting in evidence a "masked over" photograph of appellant, thereby allegedly enabling the jury to infer that appellant had a prior police record?

#### 1. *Independent corroboration*

The wealth of opinions in this circuit regarding the vagaries of the independent corroboration requirement for sex related offenses renders a lengthy dissertation inappropriate.[3] Therefore, what follows is only a brief summary of the guidelines which we must respect. (1) Corroboration of the testimony of complainants in "sex cases" is an indispensable prerequisite to conviction. *See*

---

2. Although the complainant originally described the car as a two-door, the car ultimately impounded by the police and owned by appellant's girl friend was a four-door model.

3. For an extensive background of the sex corroboration requirement in this circuit *see* Coltrane v. United States, 135 U.S. App.D.C. 295, 418 F.2d 1131 (1969).

Coltrane v. United States, 135 U.S.App. D.C. 295, 418 F.2d 1131 (1969), and the cases cited therein at footnote 12. (2) There must be corroboration as to both the *corpus delicti* and the identity of the assailant. Carter v. United States, 138 U.S.App.D.C. 349, 427 F.2d 619, 624 (1970). (3) The need for corroboration depends upon the danger of falsification. Thomas v. United States, 128 U.S.App. D.C. 233, 387 F.2d 191, 192 (1967). (4) Since in general the danger of an erroneous identification in a rape case is not of the same magnitude as the danger of a fabricated rape, Franklin v. United States, 117 U.S.App.D.C. 331, 330 F.2d 205, 208 (1964), the facts of a particular case may be such that a convincing identification by the complaining witness based upon an opportunity to observe need not be further corroborated. Carter v. United States, *supra*, 427 F.2d at 624. (5) The corroboration testimony need not be "direct" but may be circumstantial, for "[i]f by 'direct corroboration' is meant the testimony of an eyewitness, the result would be in most cases that conviction could not be had except upon the defendant's confession." Ewing v. United States, 77 U.S.App.D.C. 14, 135 F.2d 633, 636 (1942), cert. denied, 318 U.S. 776, 63 S.Ct. 829, 87 L. Ed. 1145 (1943). (6) Corroboration in a case involving an alleged sex offense is any evidence, outside of the complainant's testimony, which has probative value—any evidence which could convince the trier of fact that the crime was committed. United States v. Terry, 137 U. S.App.D.C. 267, 422 F.2d 704, 707 (1970). (7) While corroboration is initially a matter for the trial court, just as in any question concerning the legal sufficiency of the evidence to warrant submission of the case to the jury, it is the jury's function to decide whether the standard of corroborative proof has been met. Borum v. United States, 133 U.S. App.D.C. 147, 409 F.2d 433, 438 (1967),

cert. denied, 395 U.S. 916, 89 S.Ct. 1765, 23 L.Ed.2d 230 (1969). (8) Finally, every case must be evaluated on its own merits, Bailey v. United States, 132 U. S.App.D.C. 82, 405 F.2d 1352, 1358 (1968), and no magical quantitative balancing test utilizing a "checklist of factors" is either appropriate or workable. United States v. Terry, *supra*, 422 F.2d at 708.

When considering all of the various elements, overworked but hopefully not overworn, we must determine whether the trial judge erred in sending the case to the jury. Can we say that given proper instructions as to corroboration a reasonable juror could not conclude that the appellant was guilty of the crime charged? Patently, the answer to that question must be *no*.

■ Appellant correctly does not challenge the sufficiency of the corroboration of identity in this case, but maintains that corroboration of the *corpus delicti* is lacking. In considering the corroboation we must keep in mind that since this offense involved a "female child under sixteen years of age," the only remaining element of the *corpus delicti* is penetration, for when a child under the age of consent is involved the law conclusively presumes force and the question of consent is immaterial. Wheeler v. United States, 93 U.S.App. D.C. 159, 211 F.2d 19 (1953), cert. denied, 347 U.S. 1019, 74 S.Ct. 876, 98 L. Ed. 1140 (1954).

■ The absence of any evidence tending to show a motive for fabrication coupled with the maturity that the victim demonstrated throughout the proceedings lent inherent credence to her testimony, and while not in and of themselves corroborative, they diminished the "danger of falsification" that is the foundation of the corroboration requirement.[4] With that in mind, surely the medical testimony that Jancelyn's

---

4. Not wishing to depart from what has almost become a tradition in sex offense cases, we hereby note that "[Rape] is an accusation easily to be made and hard to be proved, and harder to be defended by the party accused, tho never so innocent."
1 Hale, Pleas of the Crown *635.

condition was consistent with penetration, her emotional state when she first revealed what had happened, when she first discussed the case with the police, and when she first identified appellant's picture, taken in conjunction with her accurate description of the scene of the events, and the description of the automobile linked to the appellant, supply more than ample corroboration of the *corpus delicti. See, e. g.,* United States v. Gambrill, 146 U.S.App.D.C. 72, 449 F.2d 1148 (1971) (credit cards stolen at time of rape found in car in which appellant was riding); United States v. Huff, 143 U.S.App.D.C. 163, 442 F.2d 885 (1971) (distraught emotional state, bump on forehead, apartment disarranged, clothes of victim in disarray); United States v. Terry, 137 U.S.App.D. C. 267, 422 F.2d 704 (1970) (bruises and contusions, prompt reporting, distraught emotional state—intent conviction); United States v. Bryant, 137 U.S.App.D.C. 124, 420 F.2d 1327 (1969) (torn dress strap—intent conviction).

## 2. *Impermissible inference*

Relying upon our opinion in Barnes v. United States, 124 U.S.App.D.C. 318, 365 F.2d 509 (1966), the appellant finds fault both with the prosecutor's use at trial of the book of photographs from which Jancelyn originally selected appellant's picture, and the submission of that same polaroid snapshot to the jury.

In his opening statement the prosecutor referred to Jancelyn's trip to the "sex squad office" a few days following the rape and to her identification of appellant after looking through several "books of photographs." While Jancelyn was testifying at the trial the prosecutor entered as an exhibit the album from which she had originally selected the appellant's photograph. Thereafter he gave the book to Jancelyn for purposes of an in-court photographic identification, which was successful. The prosecutor then placed Detective Tague

on the stand (Detective Tague was the officer present at the police station when Jancelyn originally selected the photograph), and after eliciting that the detective was employed with the sex squad and that Jancelyn had looked at the pictures at the sex squad office, the prosecutor utilized the book in subjecting the detective to questioning regarding Jancelyn's original identification. Ultimately the prosecutor sought to have not only appellant's photograph but also the entire book shown to the jury. Defense counsel strongly objected as to the book: "I don't want that volume of photographs going to the jury. There are all kinds of notations on the back of those pictures. It looks like a rogues gallery. I think it is inflammatory. The testimony is that she picked a picture out of the book and the book itself is absolutely improper to go to the jury. There is a listing there of other people." [5] The prosecutor then agreed not to submit the entire book but continued to urge that the polaroid picture of appellant be shown to the jury. After the picture was backed with a white cardboard sheet so that no prejudicial notations appeared, the court submitted it to the jury *without defense counsel objection.*[6] Finally, in his summation speech the prosecutor again referred to Jancelyn's trip to the sex squad office and subsequent identification.

The photograph in question is a polaroid snapshot showing a natural frontal pose of the appellant. There is absolutely nothing in the picture to indicate a prior criminal record or association with the police. *Barnes* is limited in its holding to the inadmissibility of photographs of a "mug shot" variety, for the court therein found that the admission of "a full-length snapshot of an ordinary nature . . . presents no problem." *Id.* at 510. The photograph in question before us today is akin to that found admissible in *Barnes,* and its admission once more presents no prob-

5. Tr. vol. II, p. 188.

6. Defense counsel, when shown the photograph prior to its submission to the jury

and after any prejudicial markings were covered, stated "Yes, that is agreeable." Tr. vol. II, p. 189.

**1220**

lem. *See* United States v. Hallman, 142 U.S.App.D.C. 93, 439 F.2d 603 (1971).

In United States v. Clemons, 144 U.S. App.D.C. 235, 445 F.2d 711 (1971), cert. denied, 404 U.S. 956, 92 S.Ct. 322, 30 L. E.2d 273 (1971), an objection was raised to a reference by the prosecutor in his opening statement concerning a previous identification of the accused through the use of pictures shown by the police. The prosecutor in *Clemons* stated that the "detective . . . got together a group of polaroid color film" from which the accused was selected, and it was argued that this would "indicate to any reasonably alert juror that 'appellant at least had a prior arrest record and probably a criminal record.'" 445 F.2d at 712–713. The court responded:

> The prosecution strategy is usually to buttress the complaining witness's in-court identification by calling forth from the witness's memory the circumstances of any prior identification. This has been a proper and strategically sound tactic for years. The photo was described to the jury as a "polaroid color film" and not as a "mug shot" such as the one that gave the court trouble in *Barnes*. Since the prosecutor's examination of his witness was not only skillful but legally faultless, we find no impropriety in the opening statement preview he gave to the jury. If we are to grant prosecutors any devices with which to buttress an in-court identification, then we must permit the method employed here.

*Id.* at 713 (footnotes omitted).

Appellant attempts to distinguish *Clemons* and *Hallman*—a case likewise ruling admissible testimony regarding a pre-trial identification from non-"mug type" photographs—in that here (1) there were incidental references to the identification taking place at the sex squad, and (2) the very book from which the photograph was selected was physically used, although not admitted as evidence, at trial. We fail to find these distinctions meriting reversal.

In any sex related case the natural inference of a reasonable juror will be that the victim worked with the vice or sex squad of the local police department in gaining the arrest of the accused. The departmentalization of the police function is neither a new nor novel idea to the ordinary citizen. Incidental references to this fact (here in the opening and closing statements, and in the examination of a detective working for the sex squad) cannot add an aura of impermissibility not present in *Clemons* or *Hallman*.

The same logic holds true for the use of the photographic album at trial. Any reasonable juror will assume a minimum of organization at the police department which would necessitate that photographs of individuals kept for reviewing are stored in other than paper sacks or old shoe boxes. Absent a showing by an appellant of some independent specific prejudice resulting from the use of the album and warranting reversal, some prejudice substantiated by more than the bare allegation that its use alone subjects the jury to an impermissible inference of a prior criminal record, we will find no prejudicial error. No such independent grounds having been alleged in this case, the conviction must stand. As Judge Leventhal stated in *Hallman, supra*, 439 F.2d at 604–605:

> A juryman might well conjecture that there must have been prior suspicion of the defendant, else why would the police have his photograph. But we cannot push sound principles to untenable extremes.
>
> If there has been basic fairness of approach, the prosecution is entitled to present evidence of pretrial identification, as being more meaningful to the jury than the more ritualized in-court identification.
>
> . . . The importance that a jury know of the reality of a fair pretrial identification weighs with more substance in the scales of justice than speculative possibility that the jury may conjecture defendant was involved in some other offense.

In upholding the conviction of appellant we feel constrained to strike a note of caution. While not error, the use of the photographic album at the trial amounted to what best can be termed "prosecutorial overkill." The identification evidence in this case was overwhelming: there was testimony that the physical description of the assailant originally given by the victim closely matched that of the accused; there was testimony regarding pretrial photographic identification of the accused, and the very photograph selected was admitted into evidence; there was testimony concerning the victim's selection of the accused from a police lineup; finally, there was an in-court identification. Considering the weight of such evidence we find questionable the prosecutor's decision to bring the album to trial for yet another photographic identification. The cumulative nature of the in-court photographic identification minimized its value, while the possibility of prejudice remained at a fairly high level. Although we find no prejudice in this case we note that in the future caution should be taken to determine if action such as this is absolutely necessary. The use of the album is in our opinion a risky prosecutorial venture, and one as to which great care should be exercised.[7]

### No. 72–1284

Appellant filed a Motion to Vacate Sentence pursuant to 28 U.S.C. § 2255 (1970) which was denied following a hearing on March 3, 1972. The basis for the motion was appellant's assertion that absent a showing that his substitute counsel for purposes of the lineup had in fact conferred with his trial counsel, he was effectively denied his sixth amendment right to assistance of counsel. United States v. Wade, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967).

The court below reached the following conclusions of fact that we find to be clearly supported by the record: the defendant was represented by substitute counsel at the lineup at which he was identified by the complainant; neither substitute nor trial counsel had a clear recollection as to whether they communicated concerning the circumstances of the lineup; neither substitute nor trial counsel could find anything objectionable with respect to the lineup. Furthermore, prior to trial, trial counsel received an abundance of information concerning the lineup from the following sources: (a) communications with the Assistant United States Attorney at the preliminary hearing held the day after the lineup; (b) his examination of the complaining witness at the preliminary hearing; (c) his discovery sessions with the Assistant United States Attorney prior to trial; (d) his examination of the lineup photograph and police reports of the lineup supplied to him by the government prior to the *Wade-Stovall* hearing; and, (e) his examination of witnesses at the *Wade-Stovall* hearing prior to trial.

Based on the above conclusions the court determined that there was no evidence whatsoever on the record that the pretrial lineup was either suggestive or unfair, that the presence of substitute counsel at the lineup did not contravene appellant's sixth amendment rights, United States v. Kirby, 138 U.S.App.D. C. 340, 427 F.2d 610 (1970), that appellant was not prejudiced by any possible lack of communication when trial counsel possessed all relevant information concerning the lineup, and therefore that appellant was in no way denied effective assistance of counsel. In any event, the court found that any error committed in admitting the identification testimony was harmless in view of the overwhelming evidence of guilt.

---

7. Counsel should be particularly aware of markings on the album itself, and consider the possibility that the physical presence of the book alone might work to precipitate prejudicial remarks from witnesses that normally would be suppressed. We approve the non-admission of the album into evidence and recommend caution in its use.

Harrington v. California, 395 U.S. 250, 89 S.Ct. 1726, 23 L.Ed.2d 284 (1969).

In United States v. Johnson, 147 U.S. App.D.C. 31, 452 F.2d 1363 (1971), while expressing no opinion on the merits of appellants' claims that they were denied effective assistance of counsel because of an alleged failure of their substitute lineup counsel to communicate with trial counsel, we remanded to the district court to enable the appellants to supplement the record. We thus took note in *Johnson,* as we had earlier in Marshall v. United States, 141 U.S.App. D.C. 1, 436 F.2d 155 (1970), of the gravity of the issue of effective representation raised in matters such as this. In *Marshall* the court went so far as to suggest that, at least in some circumstances, the government might well have to assume the burden of ensuring that substitute counsel's observations are transmitted to the trial counsel.[8] Appellant urges this court to adopt the policy that if the prosecution cannot prove communication between trial and substitute counsel error must be recognized regardless of the lack of prejudice apparent after a full hearing on the matter. We firmly disagree that such is required.

 Recently, in United States v. Smallwood, 153 U.S.App.D.C. 387, 473 F.2d 98 (1972), this court was faced with the identical allegation that substitute counsel representing the appellant at lineup was ineffective "because he failed to provide trial counsel with an account of the lineup." The court in *Smallwood* engaged in an independent analysis of the lineup and considered the information available to the trial counsel in concluding that no reasonable possibility of prejudice had been proven:

> Failure to communicate with substitute counsel would have been of consequence if he had significant information to communicate. There is no indication, however, that substitute counsel had such information, and any suggestion that he did must be founded on sheer speculation and surmise.

At 101. Impliedly, therefore, the *Smallwood* court rejected the absolute bar proposed by the appellant in the case before us.[9]

 It is plainly one thing to say that if the prosecution fails to ensure counsel collaboration regarding the lineup procedures that it must suffer the consequences if, following a full hearing on the matter, a reasonable possibility of

8. The *Marshall* court stated, 436 F.2d at 160 n. 18:

> Where the Government elects to use "substitute" counsel to satisfy an accused's Sixth Amendment rights, it may well be incumbent upon the prosecution to ensure that the observations and opinions of the substitute counsel are transmitted to the accused's subsequently appointed trial counsel. Under this view, the "diligence" of the trial counsel in learning of events at the lineup is not particularly relevant. Unless the Government takes affirmative action to provide trial counsel with the report of substitute counsel's observations, the defendant may be denied his Sixth Amendment right to effective assistance of counsel. *Cf.* Levin v. Katzenbach, 124 U.S.App.D.C. 158, 363 F.2d 287 (1966).

In *Marshall* the substitute counsel had left the country and could not be located for consultation. His notes were unavailable to trial counsel, and notes made by other Legal Aid attorneys present at the

time were "buried" in the agency's files, and not located until after the trial. 436 F.2d at 158 n. 9.

9. Chief Judge Bazelon, writing a separate concurring opinion in *Smallwood,* opted for adoption of a *per se* exclusion rule "[i]f the Government, after providing substitute counsel, fails to make reasonably available to trial counsel either the substitute counsel or the observations he made at the hearing . . . ." At 102. Here, as in *Smallwood,* there is no evidence that trial counsel "lacked reasonable access" to the substitute counsel. We take note of the Government's obligation to provide effective assistance of counsel, and will not allow the use of substitute counsel to degenerate into a meaningless sham. We cannot agree, however, with the contention that *Wade* requires the *per se* exclusion of lineup testimony should the Government fail to arrange a meeting between trial and substitute counsel. Standing alone, such inaction simply is not enough.

prejudice to the defendant emerges, but it is quite another thing to say that when no meaningful possibility of prejudice appears following a hearing the prosecution must suffer for failure to arrange a meaningless conference. In other words, if failure to communicate results in fact in a lack of the effective assistance of counsel mandated by the sixth amendment then the Government, as opposed to the defendant, should be held responsible and the lineup evidence suppressed. That simply is not this case, however, and we cannot read either *Johnson, Marshall,* or *Smallwood,* as intimating that a more stringent requirement is essential to the protection of a defendant's constitutional rights.

In this case there was a full hearing during the course of which all relevant evidence regarding the purported sixth amendment violation was received. There was no showing of prejudice. Counsel were unable to conclusively state that they had not conferred, and clearly the appellant was not harmed in any event. The findings of the district court should be upheld.

The conviction of appellant for violation of D.C.Code § 22–2801 (1967), and the denial of the Motion to Vacate Sentence filed pursuant to 28 U.S.C. § 2255 (1970), are accordingly

Affirmed.