**UNITED STATES of America**

v.

**David A. WILEY, Appellant.**

**No. 72–1878.**

United States Court of Appeals,
District of Columbia Circuit.

Argued April 16, 1973.

Decided Oct. 12, 1973.

Rehearing Denied Jan. 4, 1974.

John G. Keller, Washington, D. C.,
with whom Lois J. Schiffer, Washing-

ton, D. C. (both appointed by this Court), was on the brief, for appellant.

William A. White, Asst. U. S. Atty., with whom Harold H. Titus, Jr., U. S. Atty., John A. Terry and Kenneth Michael Robinson, Asst. U. S. Attys., were on the brief, for appellee. Peter C. Schaumber, Asst. U. S. Atty., also entered an appearance for appellee.

Before BAZELON, Chief Judge, WISDOM,* Circuit Judge for the Fifth Circuit, and WILKEY, Circuit Judge.

WISDOM, Circuit Judge:

David Wiley, the appellant, and Eugene Cunningham, a co-defendant, were arrested on March 17, 1971, in connection with an alleged sexual assault on the same date on twelve-year old Maxine Lewis. By a two-count indictment filed May 25, 1971, they were charged with carnal knowledge (22 D.C.Code § 2801) and taking indecent liberties with a minor child (22 D.C.Code § 3501(a)). Wiley was tried separately on May 22, 1972. After a jury trial the trial court dismissed the indecent liberties count and submitted the case to the jury on the charge of carnal knowledge. The jury found Wiley guilty, and on August 18, 1972, he was sentenced to a term of four to twelve years. The principal issue on appeal is whether there was sufficient corroborative evidence to take the case to the jury. We find that there was not sufficient corroborative evidence and therefore reverse.

I.

At about 5:00 p. m. on March 17, 1971, Maxine Lewis arrived at 240 W Street, N.W. to meet a friend, Sandra Wiggins, with whom Miss Lewis planned to visit a relative in the hospital. She was invited inside the apartment by Wiley's girl friend, Delores Smith. There, she encountered Eugene Cunningham, a friend of another woman who also lived in the apartment. Miss Lewis testified that Cunningham came and sat next to her. He "started feeling all over me and I try to get away from him, but I couldn't". Miss Smith went to a bedroom in the back of the apartment and returned with Wiley, who looked as though he had been sleeping. Miss Lewis testified that Wiley grabbed her by the legs while Cunningham was choking her. They dragged her into the bedroom, closed the door, put a dresser across it, and threw her on the bed. Cunningham held her in a choking grip and Wiley held her legs and pulled her clothes off. She testified that Cunningham then "had sex with me." Then, "David had sex with me". On closer questioning, Miss Lewis stated that the penis of each man had penetrated her and that each ejaculated. As soon as Wiley and Cunningham freed her, she went to the bathroom to "fix [herself] up", then ran out of the apartment, leaving her coat behind.

Miss Lewis found a telephone booth to call the police, but saw Wiley and Cunningham approaching. She hung up the telephone and fled. Shortly afterwards she noticed a police officer on a scooter talking to some people, but she was too embarrassed to approach him and continued on her way. She finally managed to call the police from a public telephone at 4th and U Streets, N.W. When Officers Dye and Kraigler responded to her call, Miss Lewis told these officers that she had been raped by Wiley and Cunningham.

Miss Lewis also testified about her relationships with the people involved in the incident. She had seen Wiley four or five times before the day of the assault, and he had "never said nothing to me out of the way". She stated that she had never dated Wiley or Cunningham and had only spoken a few words to either. When asked how she got along with Miss Smith, she replied: "She used to ·accuse me of doing things that I didn't do . . . like something missing of hers, like food stamps or some money, I always get the blame," although she never took any of Miss

* Sitting by designation pursuant to 28 U.S.C. § 291(a).

Smith's things. On cross-examination, she testified that she was angry at Miss Smith for not helping her during the incident but that she hadn't mentioned this fact to Miss Smith. She further testified that she could have known that Miss Smith wasn't going to help her "by the way she probably set him [either Wiley or Cunningham] up to do it".

Two police officers testified at trial about the events following Miss Lewis' departure from the apartment. Officer James Gordon, the police officer on the scooter, stated that on March 17 he was about two blocks from 240 W Street, N. W., when he noticed Miss Lewis. He said:

> I observed a young lady coming off the intersection of 4th and Elm Streets, appeared to be crying. I noticed it was cold and she didn't have a coat, blouse was deranged on her, so I took notice of her and I think she took notice of me, so I made no effort to see what the problem was, she didn't come over.

Minutes later, Officer Gordon heard a radio run to check for a possible criminal assault at 4th and U Streets; he went around the corner to check the report, and talked to Miss Lewis. She pointed down the street toward the alleged suspects. Officer Gordon then passed the two men whom Miss Lewis later identified as Wiley and Cunningham.

Officer Kaigler testified that he was patrolling in a scout car with his partner, Officer Norman Dye. At 5:39 p. m., they received a radio run for a possible criminal assault. They went to the corner of 4th and U Streets, N.W., where they found Miss Lewis. Officer Kaigler stated:

> She was a young lady, she appeared to be upset, she was crying as she walked up to the car. We asked the young lady did she call the police and she indicated she did.

Miss Lewis and the officers drove in the car toward the apartment. En route, she pointed out Cunningham and Wiley on the street and named them. Officer Kaigler testified that when Wiley and Cunningham saw the car coming, they turned down another block. The police stopped Wiley and Cunningham, and Miss Lewis identified them; they were arrested. Miss Lewis was then taken to a hospital where a doctor examined her.

Sandra Wiggins, the friend whom Miss Lewis was to meet at the apartment, testified that during that evening she was riding in a car when she saw Miss Lewis "standing at 4th and U by some phone booths". Miss Wiggins did not stop.

Wiley took the stand in his own behalf. He testified that on March 17 he had been asleep in one of the bedrooms of the apartment since 12:00 or 1:00 p. m. when Miss Smith awakened him and asked him to tell Cunningham to leave Miss Lewis alone. Wiley got up, and when he saw that Cunningham was bothering Miss Lewis, told him to stop it. Wiley then went back to sleep. Later, he was awakened by Cunningham. Both left the apartment to visit Cunningham's girl friend to get some money. Wiley stated that he did not see Miss Lewis in a telephone booth during their walk. En route, they were arrested by the police. Wiley stated that he did not see the police car until he was stopped.

Wiley expressly denied that he had helped Cunningham take Miss Lewis into the bedroom, that he himself had gone into the bedroom with Miss Lewis, and that he ever had sexual relations with Miss Lewis. Wiley stated that he did not hear Miss Lewis run out of the apartment crying, nor did he hear any argument in the bedroom while he was asleep. Also, he testified that Miss Lewis and Miss Smith "got along as I seen", and that he and Miss Lewis were good friends. As to the relationship between Miss Lewis and Cunningham, Wiley stated that Cunningham was "always picking at her", that he was "messing with her, all the time, arguing". He further testified that although they made repeated attempts, neither he nor

his mother had been able to locate Miss Smith to have her testify.

Wiley was arrested on March 17, 1971. After a preliminary hearing on March 26, 1971, Wiley was indicted on May 25, 1971. Subsequent events delayed the trial date until May 22, 1972. By that time, Cunningham had fled the jurisdiction. Dr. Matthews, who had examined the complainant on the date of the incident, was not subpoenaed by the Government on May 22, 1972, because he was on vacation. Indeed, no medical testimony was introduced at trial.

At the close of the Government's case, the defense moved for a judgment of acquittal on the indictment on the ground that there was insufficient corroboration of the complainant's testimony. As noted, the trial court later dismissed the charge of indecent liberties and submitted the case to the jury on the charge of carnal knowledge. The court also submitted an aiding and abetting instruction.

The jury returned a verdict of guilty. After the trial court denied a motion for acquittal n. o. v. or for a new trial, Wiley appealed.

## II.

It is established law in this jurisdiction that a person may not be convicted of a "sex offense" on the uncorroborated testimony of the alleged victim. Bailey & Humphries v. United States, 132 U.S.App.D.C. 82, 405 F.2d 1352 (1968); Duckett v. United States, 133 U.S.App.D.C. 305, 410 F.2d 1004 (1969); United States v. Medley, 146 U.S.App.D.C. 396, 452 F.2d 1325 (1971). The corroboration requirement provides an essential safeguard in such cases where the risk of unjust conviction is high. Complainants all too frequently have "an urge to fantacize or even a motive to fabricate". Coltrane v. United States, 135 U.S.App.D.C. 295, 418 F.2d 1131, 1135 (1969). Typically, the "innocent as well as the guilty have only their own testimony upon which to rely", and the nature of the charges "poses an un-

usual threat to the reliability of a judgment on credibility of the allegedly defiled *vis a vis* the alleged defiler". 418 F.2d 1135.

This Circuit has avoided imposing rigid rules concerning corroboration. See United States v. Terry, 137 U.S.App.D.C 267, 422 F.2d 704, 708 (1970). In general, the degree of corroboration required will vary according to the danger of fabrication by a particular complainant. With respect to the *corpus delicti*, for example, it is not always necessary to introduce independent evidence to corroborate each and every element of the offense. Rather, "independent corroborative evidence will be regarded as sufficient when it would permit the jury to conclude beyond a reasonable doubt that the victim's account of the crime was not a fabrication". United States v. Gray, 155 U.S. App.D.C. 275, 477 F.2d 444 (1973). *See* United States v. Terry, supra; United States v. Huff, 143 U.S.App.D.C. 163, 165–166, 442 F.2d 885, 887–888 (1971); United States v. Jones, 155 U.S.App.D.C. 328, 477 F.2d 1213 (1973). The quantum of proof required will depend upon such factors as the age and impressionability of the complainant and the presence or absence of any apparent motive. United States v. Gray, *supra*. This flexible approach to the corroboration rule focuses attention on the facts of each case. For example, scrutiny must be exercised where, as here, the complainant is a young girl. Courts have exhibited a "traditional skepticism" towards accusations of children. Wilson v. United States, 106 U.S.App.D.C. 226, 271 F.2d 492 (1959). In such cases, the offense may not be established by the testimony of the victim alone.

Applying this standard to the present case, we find that there was not sufficient corroboration to warrant submission of the case to the jury. The elements of the offense of carnal knowledge are: (1) penetration, (2) with a child under the age of sixteen. D.C.C.E. § 22–2801, ¶ 2; Wheeler v. United

States, 93 U.S.App.D.C. 159, 211 F.2d 19, 21 (1953), cert. denied, 347 U.S. 1019, 74 S.Ct. 876, 98 L.Ed. 1140 (1954). In its instruction to the jury, the trial court set forth the principal corroboration testimony introduced:

"The testimony of Officer Gordon, that shortly after the alleged event he saw the complaining witness on the street in a disheveled condition, crying and upset, and without a coat, although it was a cold day, and that she told him she had been attacked and pointed at a group of people a block and half away in which she said two of them were the people involved in this offense.

And the testimony of Officer Kaigler that shortly after the alleged attack he saw the complaining witness on the street, that she appeared upset, crying, and reported that she had been raped by this defendant and by Cunningham."

■ Corroboration, therefore, consisted of testimony of the two officers to the effect that (1) the complainant was crying and upset, (2) her clothing was disheveled, (3) she had no coat even though it was a cold day, and (4) the complainant's prompt report of the alleged incident to the officers. Although this evidence may corroborate the occurrence of some event, it does not corroborate sexual intercourse.

The most effective corroboration of the complainant's testimony would have been medical evidence. Here, Miss Lewis was examined by a doctor shortly after the alleged incident. Notwithstanding the importance of the medical evidence, the Government went to trial without having subpoenaed the examining physician. The Government was well aware of the significance of that evidence and had subpoenaed the doctor on the three prior dates set for trial. At the time of the fourth and final trial date, the doctor was on vacation. The Government's decision to proceed without him was irresponsible. Medical evidence may not be an indispensable prerequisite to conviction where other independent evidence is introduced to corroborate sexual intercourse.[1] But in the instant case, no such evidence was presented. As a practical matter, the Government's case rested almost exclusively on the testimony of the child. Any inference that sexual intercourse or penetration occurred must be based on her bare accusation. In these circumstances, the traditional purpose of the corroboration requirement—avoidance of fabricated charges—requires reversal of the defendant's conviction.

■ Nor was the evidence sufficient to warrant submission of the case to the jury on the theory that the defendant was an aider and abettor in Cunningham's act of carnal knowledge. The elements of the offense of aiding and abetting are: (1) guilty knowledge on the part of the accused; (2) that an offense was committed by someone; and (3) that the defendant assisted or participated in the commission of the offense. United States v. Harris, 140 U.S.App.D.C. 270, 435 F.2d 74, 88, n. 40 (1970), cert. denied, 402 U.S. 986, 91 S.Ct. 1675,

1. See Bailey & Humphries v. United States, *supra* (carnal knowledge) ; Coltrane v. United States, *supra* (sodomy) ; United States v. Green, 139 U.S.App.D.C. 75, 429 F.2d 754 (1970) (rape) ; Carter v. United States, 138 U.S.App.D.C. 349, 427 F.2d 619, 623 (1970) (rape) ; Johnson v. United States, 138 U.S. App.D.C. 174, 426 F.2d 651, 652–653 (1970) cert. denied, 401 U.S. 846, 91 S.Ct. 1258, 28 L.Ed.2d 523 (1971) (rape) ; Washington v. United States, 136 U.S.App.D.C. 54, 419 F. 2d 636, 637 (1969) (rape) ; Gass v. United States, 135 U.S.App.D.C. 11, 416 F.2d 767, 769 (1969) (rape) ; Duckett v. United States, 133 U.S.App.D.C. 305, 410 F.2d 1004, 1005 (1969) (carnal knowledge) ; Borum v. United States, 133 U.S.App.D.C. 147, 409 F.2d 433, 437–438 (1967) (rape), cert. denied, 395 U.S. 916, 89 S.Ct. 1765, 23 L. Ed.2d 230 (1969) ; Thomas v. United States, 128 U.S.App.D.C. 233, 387 F.2d 191 (1967) (carnal knowledge) ; McGuinn v. United States, 89 U.S.App.D.C. 197, 191 F.2d 477, 478 (1951) (rape) ; Ewing v. United States, 77 U.S.App.D.C. 14, 135 F.2d 633 (1942), cert. denied, 318 U.S. 776, 63 S.Ct. 829, 87 L.Ed. 1145 (1943) (rape).

29 L.Ed.2d 152 (1971). Even when the evidence is viewed in the light most favorable to the Government, it is clear that there was insufficient corroboration proved in this case to show that carnal knowledge was committed by anyone—either Wiley or Cunningham. The defendant's alleged assistance or participation in any act of carnal knowledge is similarly uncorroborated.

We therefore conclude that the defendant's conviction must be reversed. For this reason, we need not consider the other issues raised by the defendant.

BAZELON, Chief Judge (concurring):

The requirement of corroboration in sex offenses, particularly rape, has come under sharp attack in recent years.[1] Feminists have found the requirement unjust to women[2] and prosecutors have argued that it makes convictions too difficult to obtain.[3] These criticisms force us to examine the origins of the current views on corroboration.

### I

The notion that the testimony of a single witness is inadequate to prove a crime is an ancient one. The Code of the Emperior Justinian provided that on any important issue the testimony of one witness was insufficient.[4] Ecclesiastical law refined this approach by requiring, for example, that against the word of a Cardinal, forty-four witnesses were required.[5] But the common law gradually moved toward other modes of inquiry into the truth. Ultimately the common law rejected the requirement of corroboration for all crimes except perjury.[6] Thus there was no common law requirement of corroboration for any sex offense.[7]

Today thirty-five states have similarly rejected the corroboration requirement for rape.[8] Of those jurisdictions that retain the requirement, about half, including the District of Columbia, do so in the absence of legislation.[9] The substance of corroboration requirements varies enormously from state to state, ranging from a requirement of corroboration for force, penetration and identity, to minimal corroboration of any part of the complainant's testimony.[10]

### II

Numerous justifications have been advanced for the requirement of corroboration in sex cases. An examination of these rationales reveals a tangled web of legitimate concerns, out-dated beliefs, and deep-seated prejudices.

1. See, e. g., Report of the District of Columbia Public Safety Committee Task Force on Rape, at 51–55 (July 9, 1973) [hereinafter Task Force Report]; Note, The Rape Corroboration Requirement: Repeal Not Reform, 81 Yale L.J. 1365 (1972) [hereinafter Repeal Not Reform].

2. See, e. g., Lear, Q. If you Rape a Woman and Steal Her TV, What Can They Get You for in New York? A. Stealing Her TV, N. Y. Times, Jan. 30, 1972, § 6 (Magazine), at 11.

3. See, e. g., Ludwig, The Case for Repeal of the Sex Corroboration Requirement in New York, 36 Brooklyn L.R. 378 (1970) [hereinafter Ludwig].
Criticism was particularly severe of the pre-1972 New York law which required corroboration of each material element of the offense. This criticism led to modification of the New York requirement. Repeal Not Reform at 1365, 1368.

4. Younger, The Requirement of Corroboration in Prosecutions for Sex Offenses in New York, 40 Fordham L.Rev. 263 (1971) [hereinafter Younger]. Younger relies on 7 J. Wigmore, Evidence §§ 2030–2032 (3d ed. 1940) [hereinafter Wigmore] and 9 W. Holdsworth, History of English Law 203–211 (3d ed. 1944). Justinian's general principle was called the rule of number.

5. Id.

6. Id. at 264.

7. See 7 Wigmore § 2061, at 342. The statement to the contrary in People v. Friedman, 139 App.Div. 795, 796, 124 N.Y.S. 521, 522 (2d Dep't 1910) is unsupported by authority.

8. Repeal Not Reform at 1367.

9. Id. at 1367, 1368, notes 14–18.

10. Id. at 1368–1370.

The most common basis advanced for the requirement is that false charges of rape are more prevalent than false charges of other crimes.[11] A statement such as this is extremely difficult to prove, and little or no evidence has been adduced to support it.[12] Two reasons are generally given for the belief that unfounded rape charges are common. It is argued, first, that women often have a motive to fabricate rape accusations and second, that women may fantasize rapes.[13]

It is contended that a woman may fabricate a rape accusation because, having consented to intercourse she is ashamed and bitter, or because she is pregnant and feels pressured to create a false explanation, or because she hates the man she accuses or wishes to blackmail him.[14] It is said to be relatively easy to create a false description of rape in convincing detail.[15]

There are, however, countervailing reasons not to report a rape. One said to be a victim of rape may be stigmatized by society, there may be humiliating publicity, and the necessity of facing the insinuations of defense counsel may be a deterrent.[16] Moreover, those claiming to have been raped may be treated harshly by the police and by hospitals.[17] One result of all of these obstacles is that rape is one of the most under-reported of all crimes.[18]

It is difficult to say whether those inclined to falsify a charge of rape are deterred by the same factors that deter the reporting of actual rapes. A falsifier, for example, may be a seeker of publicity rather than one who shuns it.

In addition to fabricated rapes, it has been suggested that women may report fantasized rapes.[19] Both the causes and prevalence of rape fantasies have been

11. See, e. g., Note, Corroborating Charges of Rape, 67 Colum.L.Rev. 1137 (1967) [hereinafter Corroborating Charges]; Ploscowe, Sex Offenses: The American Legal Context, 25 Law and Contemp.Prob. 217 (1960).

12. The report of the District of Columbia Public Safety Committee Task Force, see note 1, supra, contends that:

That allegation, by now transformed into an accepted "truth", even judicial doctrine, that women often fantacize or fabricate false charges of rape, has been reported over and over without citing any supporting evidence. . . .

In all offenses, including rape, some false and mistaken accusations will be made. For example it is not uncommon for a person to complain that a friend pointed a gun or waved a knife at him—an assault with a dangerous weapon. It may well be that no weapon is found and the complainant has a motive to lie, but there is no corroboration requirement.

13. See, e. g., Coltrane v. United States, 135 U.S.App.D.C. 295, 298–299, 418 F.2d 1131, 1134–1135 (1969) ("We know from the lessons of the past that all too frequently such complainants have an urge to fantacize or even a motive to fabricate . . .)

14. See, e. g., Corroborating Charges at 1138; J. MacDonald, Rape: Offenders and Their Victims 209–31 (1971).

15. 3 Wigmore § 924a.

16. Repeal Not Reform at 1374.

17. See Task Force Report at 11–21.

18. President's Commission on Law Enforcement and the Administration of Justice: The Challenge of Crime in a Free Society 21 (1967); Federal Bureau of Investigation, Uniform Crime Reports 1970 14 (1971). The President's Commission found that forcible rapes occurred at 3 and one-half times the reported rate.

19. See, e. g., 3A Wigmore § 924(a), at 736–746; Wedmore v. State, 237 Ind. 212, 227–239, 143 N.E.2d 649, 656–662 (1957) (Emmert, J. dissenting). The Wedmore opinion quotes the following statement of Dr. Karl A. Menninger:

. . . fantasies of being raped are exceedingly common in women, indeed one may almost say that they are probably universal. By this I mean that most women, if we may judge from our clinical experience, entertain more or less consciously at one time or another fleeting fantasies or fears that they are being or will be attacked by a man. Of course, the normal woman who has such a fantasy does not confuse it with reality, but it is so easy for some neurotic individuals to translate their fantasies into actual beliefs and memory falsifications that I think a safeguard should certainly be placed upon this type of criminal charge. Wedmore, supra at 658.

hotly disputed and it is not established that any significant number of rape charges arise out of fantasies.[20] To the extent that rape charges do so arise, that could be the result of an inferior and oppressed status of women that is now being eroded.[21]

With both fabricated and fantasized rapes it appears well-established that what dangers do exist are greatest when the complainant is young.[22] Care must be taken, however, not to blindly look at chronological age when the background and experience of a complainant may make her more or less likely to be prone to the suggestiveness that at times makes the young unreliable witnesses.

In addition to the problem of false charges, the corroboration requirement is justified on the theory that rape is a charge unusually difficult to defend against. In 1680 Lord Chief Justice Hale wrote, in one of the most oft-quoted passages in our jurisprudence, that rape "is an accusation easily to be made and hard to be proved, and harder to be defended by the party accused, tho never so innocent."[23] The same theme has been echoed by modern commentators and courts.[24] The usual absence of eyewitnesses damages the defendant as well as the complainant. Juries are said to be unusually sympathetic to a woman wronged, thus weakening the presumption of innocence.[25]

Again, there is little hard evidence with which to test this theory. What studies are available suggest that a de-fendant is unlikely to be convicted of rape on the uncorroborated testimony of the complainant in those jurisdictions that do not require corroboration.[26] Thus juries may be more skeptical of rape accusations than is often supposed.

Another justification for the corroboration requirement is the prevalence of severe penalties for rape. For many years rape was punishable by death in many states.[27] Today rape is still among the most severely punished of crimes.[28] One result has been the development of rules such as the corroboration requirement. Proposals that the corroboration requirement be abandoned are at times coupled with proposals that the penalties for rape be reduced.[29] Reformers are subject to certain tensions on this issue. On the one hand, they seek to bring standards of proof and punishment for rape in line with those for other crimes of violence. Thus it is argued that "As long as rape is. viewed primarily as a sexual crime rather than as a crime of violence and power, society will continue to react to rape as it has in the past. The goal . . . is to normalize the crime of rape."[30] On the other hand, reformers note that rape is an unusually traumatic experience. Special procedures are suggested for rape victims.[31] We are told that "rape is considerably more than mere physical assault. It is a psychic violation also, a serious injury against the victim's emotions and spirit that may cause mental torment difficult or impossible to be eased."[32] In light of this there may

---

20. Repeal Not Reform at 1376–1378.

21. *Id.*

22. *Id.* at 1388–90, and sources cited therein.

23. 1 M. Hale, Pleas of the Crown 636 (1680).

24. Corroborating Charges at 1139.

25. *Id.*

26. Repeal Not Reform at 1382–1389.
   The conclusion here is based on an analysis of the Kalven and Zeisel empirical study of criminal juries. H. Kalven and H. Zeisel, The American Jury (1966).

27. Task Force Report at 6.

28. *Id.*

29. *Id.* at 9.

30. *Id.* at 35.

31. *Id.* at 14.

32. Coleman McCarthy, The Crime of Rape, The Washington Post, August 8, 1973, p. A18, col. 3. *See, also,* Mary Ann Largen, Coordinator, Rape Task Force, National Organization for Women, Letter to The Washington Post, August 16, 1973, p. A21, col. 1 ("The emotional trauma of a rape victim is seldom, if ever, understood by the police,

well be resistance to lowering the penalties.

Still another basis for the corroboration requirement lies in "the sorry history of racism in America." [33] There has been an enormous danger of injustice when a black man accused of raping a white woman is tried before a white jury.[34] Of the 455 men executed for rape since 1930, 405 (89 percent) were black.[35] In the vast majority of these cases the complainant was white.[36]

All of the safeguards that developed in this context should not be automatically applied today. Juries are more integrated than in the past and racial prejudice may be at a somewhat lower level. Numerous rape victims are black and their interests, as well as those of white women, may have been slighted by the concern for black defendants.

A final theory of the corroboration requirement is that it stems from discrimination against women. It is said that traditional sex stereotypes have resulted in rape laws that protect men rather than women. Penalties are high because a "good" woman is a valued possession of a man. Corroboration is required because to a "good" woman rape is "a fate worse than death" and she should fight to the death to resist it. If no such fight is put up, the woman must have consented or at least enticed the rapist, who is therefore blameless.[37] In sum it is said to be the "male desire to 'protect' his 'possession' which results in laws de-signed to protect the male—both the 'owner' and the assailant—rather than protecting the physical well-being and freedom of movement of women." [38]

This point of view, which has been expressed by men as well as women,[39] may well have some validity. It would be surprising if entrenched notions of sexuality did not play a role in the law of crimes dealing with sexual violations. Corroboration rules may be structured, for example, to protect male rather than female defendants. This could explain the fact that conviction for soliciting for homosexual purposes requires corroboration while soliciting for heterosexual prostitution does not.[40]

Ultimately modern notions of sexual equality may help breakdown those aspects of rape law which stem from unjust discrimination against women.

### III

Analyzing all of these justifications in order to separate the valid from the invalid is no easy task. As I have said in another context, we are in that terrible period known as "meanwhile." We know enough to be troubled but not enough to know how to resolve our troubles.[41] As evidence, mores, and attitudes change we too must remain open to change. Next year or twenty years from now available information may require at different approach. But at least for the immediate present, I find that the flexible corroboration rule developed

doctors, and courts. Likewise, it is seldom understood by the woman's family, friends, and society in general.")

33. Task Force Report at 5.

34. Repeal Not Reform at 1380.

35. *Id.* at note 103.

36. *See* Ronald Goldfarb, Rape and Law Reform, The Washington Post, August 2, 1973, p. A24, col. 2. Goldfarb reports the estimate that, although capital punishment is available for crimes other than rape, the single category of rapes of whites by blacks accounts for most sentences to capital punishment in the United States.

37. Task Force Report at 3–4.

38. Mary Ann Largen, *supra*.

39. *See, e. g.*, Younger at 276, note 105 ("When all is said and done, it just might be that the requirement of corroboration in prosecutions for sex offenses (where, remember, the complainant is usually female and the defendant almost always male) is nothing more than an illustration of the law's unequal treatment of women.")

40. *Cf.* Kelly v. United States, 90 U.S.App.D. C. 125, 194 F.2d 150 (1952) and Price v. United States, 135 A.2d 854 (D.C.Ct.App. 1957).

41. David L. Bazelon, "Justice Stumbles Over Science," Transaction (July/August 1967) 8, 11.

by this Court provides the best accommodation of numerous conflicting considerations. There may still be the possibility of special fabrication problems relating to rape, particularly where, as in this case, the complainant is young. There are still severe penalties for rape. There is still racism in our society and that racism may be particularly likely to surface in a case involving alleged sexual violations.

To guard against these possible dangers we retain a corroboration rule which provides that "independent corroborative evidence will be regarded as sufficient when it would permit the jury to conclude beyond a reasonable doubt that the victim's account of the crime was not a fabrication." United States v. Gray, 155 U.S.App.D.C. 275 at 276, 477 F.2d 444 at 445 (1973.) We adhere to no absolute tests or concrete guidelines.[42] We only require evidence of the crime of probative value outside of the complainant's testimony.[43] In cases such as this one where that evidence is lacking the dangers to the defendant outweigh the difficulties created for the prosecution.

The net effect of our current approach does not appear to make convictions for rape unusually difficult in this jurisdiction. Available statistics indicate that the conviction rate for rape in the District of Columbia is actually higher than it is for the United States as a whole, and most states do not require corroboration.[44]

Thus I concur in the court's opinion reversing defendant's conviction.

WILKEY, Circuit Judge, dissenting:

In spite of the conscientious effort my two distinguished colleagues have made in examining the law, especially as it relates to corroboration in sexual assault cases, I submit that they have reached the wrong result in this particular case. I believe this is apparent from the law in this jurisdiction, when applied to the facts herein, both as stated in the majority opinion of Judge Wisdom. Chief Judge Bazelon's concurrence is a thoughtful essay with which anyone would find it difficult to take issue, but with all due respect, it does not point the way to a decision in Wiley's case. In my view, the errors of the majority are clearly demonstrable as two:

1. The requirement of specific medical corroboration of one single fact conflicts with our previous decisions, and leads with inevitable logic to the conclusion that no rape conviction is sustainable without medical testimony confirming penetration, despite the established medical view that in many instances after the event a medical examination cannot determine one way or another whether forcible penetration took place; and

2. In the circumstances of this case, given the uncontradicted testimony of the 12 year old victim on the question of forcible penetration and the testimony of appellant Wiley, the majority has focused on the wrong issue on which corroboration is relevant.

I. *The Standard of Corroboration in this Jurisdiction.*

With admirable clarity, Judge Wisdom has set forth the standard we have required in this jurisdiction: "This Circuit has avoided imposing rigid rules concerning corroboration. (Citation omitted) In general, the degree of corroboration required will vary according to the danger of fabrication by a particular complainant. With respect to the *corpus delicti*, for example, it is not al-

42. Bailey v. United States, 132 U.S.App.D.C. 82, 88, 405 F.2d 1352, 1358 (1968).

43. United States v. Jones, 155 U.S.App.D.C. 328, 477 F.2d 1213, 1218 (1973).

44. The latest estimate for the District of Columbia is that about 45% of those charged with rape are convicted of rape. Task Force Report at 25–26 (120 convic-

tions of 269 tried). The comparable figure for the United States as a whole is 36.1%. Repeal Not Reform at 1370, note 38. Statistics generally indicate that only states with a very strict corroboration requirement, such as the old New York requirement, have a markedly low percentage of rape convictions. *Id.*

ways necessary to introduce independent evidence to corroborate each and every element of the offense. Rather, 'independent corroborative evidence will be regarded as sufficient when it would permit the jury to conclude beyond a reasonable doubt that the victim's account of the crime was not a fabrication'". For these principles *Gray*[1], *Terry*[2], *Huff*[3], and *Jones*[4] are cited.

Our most recent decision is United States v. Gray, 30 March 1973.[5] *Gray* requires the affirmance of Wiley's conviction here, for precisely the same issue as to the absence of medical corroboration of the complainant's testimony as to sexual intercourse was raised in *Gray*.

"Appellant urges that corroboration of the *corpus delicti* requires independent evidence tending to establish each and every material element of the offense. Specifically, he contends that because the Government's proof as to penetration rested wholly on the complainant's testimony, his conviction must be reversed. Although there are statements in Allison v. United States, 133 U.S. App.D.C. 159, 409 F.2d 445 and United States v. Bryant, 137 U.S.App.D.C. 124, 420 F.2d 1327 that support appellant's position, our more recent decisions make it clear that *Allison* and *Bryant* no longer reflect the controlling law." (citations omitted) "Simply put, the principle emerging from these cases is that the independent corroborative evidence will be regarded as sufficient when it would permit the jury to conclude beyond a reasonable doubt that the victim's account of the crime was not a fabrication."[6]

While it may be argued, or denied, that the overall corroborative circum-stances were stronger in *Gray* than in Wiley's case, corroboration here (particularly when analysis is made of what question needed corroboration, see III.B. infra) was strong enough at least to go to the jury.

*Gray* is one of many cases establishing that medical proof of forcible penetration may be impossible to obtain. "Although gynecological examination of the prosecutrix was inconclusive, she testified unequivocally that her attacker had achieved penetration."[7]

And, as to the real contested issue in Wiley's case—not whether the offense was committed but who committed it— we said in *Gray*: "Corroboration is also required as to identification of the assailant; but our cases have traditionally recognized that, as to this element, a lesser standard of proof is required. And where there is a convincing identification, one that minimizes the danger of mistake or falsification, no further corroboration is required. (Citations omitted) Here the victim identified appellant to police by name."[8] And so the victim here pointed out Wiley to officers on the street.

Bearing in mind Judge Tamm's admonition in United States v. Jones,[9] our decision immediately prior to *Gray*, that "[t]he wealth of opinions in this circuit regarding the vagaries of the independent corroboration requirement for sex related offenses renders a lengthy dissertation inappropriate,"[10] I only list "the guidelines which we must respect" from *Jones*:

"(1) Corroboration of the testimony of complainants in 'sex cases' is an in-

---

1. United States v. Gray, 155 U.S.App.D.C. 275, 477 F.2d 444 (1973).

2. United States v. Terry, 137 U.S.App.D.C. 267, 422 F.2d 704 (1970).

3. United States v. Huff, 143 U.S.App.D.C. 163, 165–166, 442 F.2d 885, 887–888 (1971).

4. United States v. Jones, 155 U.S.App.D.C. 328, 477 F.2d 1213 (1973) (Circuit Judges Tamm and Leventhal, Senior District Judge Wyzanski).

5. 155 U.S.App.D.C. 275, 477 F.2d 444, Circuit Judges Leventhal and Robb, Senior District Judge Jameson.

6. *Id.*, at 445.

7. *Id.*, at 446.

8. *Id.*, at 446.

9. United States v. Jones, *supra* note 4.

10. *Id.* 477 F.2d at 1217.

dispensable pre-requisite to conviction. (2) There must be corroboration as to both the *corpus delicti* and the identity of the assailant. (3) The need for corroboration depends upon the danger of falsification. (4) Since in general the danger of an erroneous identification in a rape case is not of the same magnitude as the danger of a fabricated rape, the facts of a particular case may be such that a convincing identification by the complaining witness based upon an opportunity to observe need not be further corroborated. (5) The corroboration testimony need not be 'direct' but may be circumstantial, for '[i]f by "direct corroboration" is meant the testimony of an eyewitness, the result would be in most cases that conviction could not be had except upon the defendant's confession.' (6) Corroboration in a case involving an alleged sex offense is any evidence, outside of the complainant's testimony, which has probative value—any evidence which could convince the trier of fact that the crime was committed. (7) While corroboration is initially a matter for the trial court, just as in any question concerning the legal sufficiency of the evidence to warrant submission of the case to the jury, it is the jury's function to decide whether the standard of corroborative proof has been met. (8) Finally, every case must be evaluated on its own merits, . . . we must determine whether the trial judge erred in sending the case to the jury. Can we say that given proper instructions as to corroboration a reasonable juror could not conclude that the appellant was guilty of the crime charged? Patently, the answer to that question must be *no*." [11]

Given the guidelines and tests of *Jones,* involving carnal knowledge of a 15 year old, and *Gray,* our last two decisions in this field, let us examine what corroboration there was of Wiley's guilt.

## II. *Corroboration of Wiley's Guilt*

First, the evidence to be corroborated. The testimony of the 12 year old victim as to the sexual assault in the apartment is, to my mind, clear, coherent, and without any internal contradictions. It is fairly set forth in Judge Wisdom's opinion. In the interest of brevity, it will not be repeated here, but we should not forget that the victim provided a complete documentation of every essential detail, unshaken on cross-examination, and uncontradicted except by the bare denial of the appellant.

Second, appellant *Wiley's testimony does not contradict the victim's assertion that a sexual assault took place.* Indeed, appellant confirms it. According to his story, he was awakened by Miss Smith (Wiley's girlfriend) who asked him to stop Cunningham from taking indecent liberties with the 12 year old. ". . . *he saw* that Cunningham was bothering Miss Lewis (the victim), told him to stop it." (Majority opinion, p. 549) Wiley says he then went back to sleep; the victim says he participated in the rape. At no time did Wiley testify that Cunningham did not, or could not, have raped the girl.

With this as the basic evidence, how much corroboration was needed *to send the case to the jury?* Here is what the District Judge had:

1. The victim reported the offense immediately. After fleeing the apartment, she found a phone booth, started to call, but on seeing Wiley and Cunningham approaching, hung up and slipped away. She *was* seen at this time by Officer Gordon, who noticed her because she was crying, obviously upset, had a disarrayed blouse, and was not wearing a coat although it was a cold day. She found another phone, called the police. When Officers Dye and Kraigler arrived, she pointed out Wiley and Cunningham by name, and stated she had been raped by them.

2. Her crying and other visible signs of emotional distress, noted first with-

---

11. *Id.* at 1217–1218. Citations for each guideline omitted.

out suggestion by Officer Gordon, then by Officers Dye and Kraigler.

3. Her disheveled clothing and her disarranged blouse, noted by all officers.

4. Her being on the street on a cold day without a coat, sufficiently odd to attract Officer Gordon's attention.

5. Finding the coat in the apartment at 240 W. Street, N.W., from whence she had fled, and claimed to have left the coat in her haste and emotional distress.

6. The complete absence of any motive on the victim's part to fabricate a story of Wiley's guilt. A portion of appellant's own testimony confirms this; he claimed "that he and Miss Lewis were good friends." (Majority opinion, p. 549) She, the victim, testified that Wiley "never said nothing to me out of the way". (Majority opinion, p. 548)

Taking this Court's test in *Jones,* "Can we say that . . . a reasonable juror could not conclude that the appellant was guilty of the crime charged? Patently, the answer to that question must be *no.*"

III. *Errors of the Majority in the Corroboration Required*

A. *Departure from this Court's Previous Decisions*

As late as 30 March 1973, we said in *Gray* [12], "Appellant urges that because the Government's proof as to penetra-

tion rested wholly on the complainant's testimony, his conviction must be reversed. Although there are statements in Allison v. United States [13] and United States v. Bryant [14] that support appellant's position, *our more recent decisions make it clear that* Allison *and* Bryant *no longer reflect the controlling law* (citing *Terry* [15], *Huff* [16], and *Jones* [17])." Fifteen days earlier we had noted in *Jones:* "(5) The corroboration testimony need not be 'direct' but may be circumstantial, for '[i]f by "direct corroboration" is meant the testimony of an eyewitness, the result would be in most cases that conviction could not be had except upon the defendant's confession.' (Citation omitted) (6) Corroboration in a case involving an alleged sex offense is any evidence, outside the complainant's testimony, which has probative value—any evidence which could convince the trier of fact that the crime was committed. (Citation omitted)" [18]

Yet, in spite of many and recent decisions of this Court to the contrary, my two colleagues focus entirely on the absence of *one special type of evidence*—medical testimony—to corroborate *one element* of the crime—penetration.[19] The majority opinion results in this rationale:

1. Proof of penetration is essential to prove rape or carnal knowledge (undisputed).

12. United States v. Gray, *supra* note 1.

13. 133 U.S.App.D.C. 159, 409 F.2d 445 (1969).

14. 137 U.S.App.D.C. 124, 420 F.2d 1327 (1969).

15. United States v. Terry, *supra* note 2.

16. United States v. Huff, *supra* note 3.

17. United States v. Jones, *supra* note 4.

18. *Id.* 477 F.2d at 1218.

19. "The most effective corroboration of the complainant's testimony would have been medical evidence. Here, Miss Lewis was examined by a doctor shortly after the alleged incident. Notwithstanding the importance of the medical evidence, the Government was well aware of the significance of that evi-

dence and had subpoenaed the doctor on the three prior dates set for trial. At the time of the fourth and final trial date, the doctor was on vacation. The Government's decision to proceed without him was irresponsible. Medical evidence may not be an indispensable pre-requisite to conviction where other independent evidence is introduced to corroborate sexual intercourse. But in the instant case, no such evidence was presented. As a practical matter, the Government's case rested almost exclusively on the testimony of the child. Any inference that sexual intercourse or penetration occurred must be based on her bare accusation. In these circumstances, the traditional purpose of the corroboration requirement—avoidance of fabricated charges—requires reversal of the defendant's conviction." Majority opinion *supra* at 551–552.

2. The victim's testimony, *if alone* on this one element, is *never sufficient* to prove penetration (*Gray, Jones,* and other decisions are *contra*).

3. Hence, either medical evidence or third party eyewitness testimony is therefore indispensable to prove penetration.

This fails to recognize: (a) that in many cases of actual penetration medical testimony cannot conclusively say whether it occurred, (*Gray,* 477 F.2d at 446); (b) that in most rape cases there will not be a third party in such an intimate position that he can (or is willing to) testify to penetration; (c) hence, there can be no conviction without the defendant's confession (*Jones,* 477 F.2d at 1218).

With all due respect to my two distinguished colleagues, what they have decided in Wiley's case is not the law at present in this jurisdiction, may never have been the law, and certainly should never be the law in this or any other jurisdiction.

### B. *Focus on the Wrong Issue on Which Corroboration was Important*

The majority opinion asserts "[t]he most effective corroboration of the complainant's testimony would have been medical evidence," and "[t]he Government's decision to proceed without [the doctor] was irresponsible." [20] Just what would the evidence of the examining physician have added to the certainty or uncertainty that appellant Wiley raped the victim? We know that the victim was raped, at least by Cunningham. The jury had the victim's testimony to this, and Wiley's testimony does not contra-

dict it. Furthermore, although of course the jury did not have this, we now judicially know that Cunningham did commit this offense; this fact was judicially established in United States v. Cunningham, No. 994–71, U.S. District Court for the District of Columbia, now on appeal in this Court, No. 73–1283. This was a separate trial of Wiley's co-defendant, Cunningham, charged and tried in the same numbered case as Wiley.

So we know the victim was *raped by Cunningham.* Granting that the jury had only the victim's testimony (uncontradicted as to the rape by Cunningham), the question before the jury was and here is, *was she also raped by Wiley?* The physician's testimony could not have answered that question. At the most, he could have testified to penetration and sperm in the vagina. But who was responsible? Cunningham, or Cunningham *and Wiley?* Wiley's defense was *not* that the rape did not, or could not have occurred; his defense was that he was asleep in the other room while Cunningham was with the 12 year old victim.

Obviously the jury disbelieved Wiley's story on the critical issue. The physician's testimony would not have been even relevant to the critical issue raised by Wiley: Was it Wiley who *also* raped the victim?

I am not overlooking the well understood principle that every element of an offense must be *proved*—but the law in this jurisdiction is that *not every element* of a sexual offense need be *corroborated.*[21] *Every element was* PROVED. The 12 year old victim's testimony was clear and unequivocal; she

20. *Ibid.* Government counsel had had the examining physician under subpoena and in courthouse attendance for three prior settings of the case. The doctor wasted numerous hours without the case ever going to trial. So, for any subsequent setting, the prosecuting attorney made an agreement with the doctor to appear without subpoena when called by phone. On the critical day the doctor was away on vacation. Record p. 49. Both sides had made motions for con-

tinuance, the Government because of the flight of co-defendant Cunningham, and the prosecution did not anticipate being put to trial, hence the failure to alert the doctor.

21. United States v. Gray, *supra* note 1, 477 F.2d at 445; United States v. Jones, *supra,* note 4 477 F.2d at 1217–1218; United States v. Terry, 137 U.S.App.D.C. at 271–272, 422 F.2d at 708–709 (1970); United States v. Huff, 143 U.S.App.D.C. at 166, 442 F.2d at 888 (1971).

was raped by *both* Cunningham and Wiley, there was penetration and ejaculation by *both*. As to Cunningham, her story was not only clear and unequivocal, it was uncontradicted. In the offense of rape there must be corroboration, and Wiley denied his participation in the criminal act. I submit there *was* sufficient corroboration in all the surrounding, undisputed circumstances, both as to the occurence of the rape and Wiley's participation. But looking at what the majority considers the critical point, insufficient corroboration, what is the specific corroboration my colleagues point to as essential, "most effective", and missing: the physician's testimony. *But the physician's testimony could never have corroborated the victim's testimony on the issue in dispute: whether Wiley, in addition to Cunningham, did accomplish penetration and thereby perpetrate a rape.*

Since the victim's testimony as to the rape having been perpetrated was uncontradicted by any witness, including appellant Wiley, and certainly was strongly supported by all attendant circumstances, the corroboration needed here is not corroboration of the rape having taken place, but of Wiley's participation therein. Consider what would have been the position of appellant Wiley and all the evidence before the jury, if the absent physician had appeared and testified to both penetration and sperm in the victim's vagina. Wiley's testimony *would not, could not, have been different.* He never testified Cunningham did not, could not, have raped the 12 year old girl. Wiley testified that he "got up, and when he saw that Cunningham was bothering Miss Lewis, told him to stop it. Wiley then went back to sleep. Later, he was awakened by Cunningham."[22] By then Miss Lewis had left the apartment and Wiley did not see her.

The absent physician's testimony thus in no way could have corroborated any fact disputed by appellant Wiley. The vital corroboration needed here is as to Wiley's participation; medical testimony could not supply this; any needed corroboration of the victim's clear and unequivocal testimony *is supplied* by all the attendant circumstances.

I trust and would sustain the jury verdict here.[23] Thus I respectfully dissent.

---

22. Majority opinion, *supra* at 549.

23. The portion of Chief Judge Bazelon's opinion directly relevant to Wiley's case is this: "Juries are more integrated than in the past and racial prejudice may be at a somewhat lower level. Numerous rape victims are black and their interests, as well as those of white women, may have been slighted by the concern for black defendants." Concurring opinion, *supra* at 555.