**UNITED STATES of America**

v.

**Philip H. GARRETT.**

**Crim. No. 82–109.**

United States District Court, District of Columbia.

June 29, 1982.

**130**

Theodore A. Shmanda, Asst. U. S. Atty., Washington, D. C., for plaintiff.

John J. Hurley, Washington, D. C., for defendant.

### FINDINGS OF FACT
### CONCLUSIONS OF LAW
### AND ORDER

JOHN GARRETT PENN, District Judge.

The defendant is charged in the first count of the indictment with aiding and abetting the transportation of a minor in interstate commerce for the purpose of prohibited sexual conduct for commercial exploitation. 18 U.S.C. §§ 2, 2423.[1]

The defendant waived his right of trial by jury on June 11, 1982, and was tried by the Court on June 17. Prior to the trial the parties stipulated into evidence the testimony of Special Agent M. Glenn Tuttle offered in the trial of Timothy McNamara, the other evidence introduced in that trial and the Court's findings of fact and conclusions of law insofar as it established the crime for which the defendant is charged with aiding and abetting.[2] At the close of the Government's case, the Court heard lengthy arguments on the defendant's motion for judgment of acquittal. Prior to the making of that motion, the defendant and then the Government advised the Court that neither side would offer further evidence. Those arguments addressed the defendant's motion made at the close of the Government's case and constituted the final arguments on the merits.

The parties agree that the primary issue is, whether on the facts of this case, the defendant is an aider and abettor.

#### I

The Court finds that the following facts have been proved beyond a reasonable doubt.

1. Throughout all relevant periods and up until the arrest of the defendant, Special Agent M. Glenn Tuttle, a Special Agent of

---

1. The codefendant, Timothy McNamara, was charged in Count 2 with transportation of a minor in interstate commerce for the purpose of prohibited sexual conduct for commercial exploitation. 18 U.S.C. § 2423. McNamara moved to dismiss the indictment as being untimely under the Speedy Trial Act, 18 U.S.C. § 3161 et seq., but that motion was denied. United States v. McNamara, Cr. No. 82–109 (D DC May 7, 1982). Thereafter, on June 15, 1982, McNamara waived his right to a trial by jury, went to trial before the Court on a stipulation of fact and the unobjected to testimony of Special Agent M. Glenn Tuttle, who was an undercover agent at the time of the offense.

McNamara was found guilty the same day and has been released pending sentence now scheduled for July 14, 1982.

2. The defendant was advised that the parties in United States v. McNamara, stipulated that the Government could offer hearsay evidence without objection and that by stipulating to the testimony and the other evidence in McNamara he was waiving objections which ordinarily would be valid. After consulting with his counsel the defendant advised the Court that he understood he was waiving objections to hearsay and other objections and that his agreement to the stipulation was voluntary.

the Federal Bureau of Investigation, was acting in an undercover capacity and passing as an out of town business man staying at a local hotel. Tuttle identified himself to the defendant as "Gene Truitt."

2. On February 17, 1982, Tuttle met the defendant in the vicinity of the Naples Cafe in the District of Columbia. During the course of the conversation Tuttle advised the defendant that he was a business man from Miami, Florida, and that he was interested in obtaining the services of a young boy for one night for sexual purposes. The conversation lasted approximately 2 or 3 minutes. Defendant indicated that Tuttle should return the next night if interested in young boys. This conversation was not recorded.

3. At approximately 10:30 p. m. on February 18, 1982, Tuttle again met the defendant outside the Chesapeake House Lounge at 746 9th Street, N.W. in Washington, D. C. They had a conversation about entering the Lounge but Tuttle declined to do so, advising the defendant that he did not want to be seen in the Lounge. The defendant attempted to interest Tuttle in a person identified as "Arthur" or in a "young blonde" but Tuttle finally advised him that he did not "want to go to bed with no 18 or 19 year old guy. I want him to be young."

4. The defendant explained that they, meaning the police, are closing down on soliciting of young boys in the area of the convention center being built and that it is difficult to find young boys for purposes of sex. During the course of this conversation Tuttle expressed concern about a man standing at a nearby bus stop, but the defendant advised him "don't worry about him. Don't worry about him. He's waiting on a bus."

5. Tuttle expressed concern that the defendant could not find him a young boy for the night but defendant offered to try to find a young boy for Tuttle on Tuttle's next trip to the city. The defendant gave Tuttle a telephone number where he could be reached. They again discussed an older boy who would be available for Tuttle in the

age range of 18 or 19 and the defendant noted that he was "smooth as a baby" and had little hair "except for his head and his crotch." Tuttle made clear however that he wanted no hair and was only interested in pre-pubescent boys.

6. The defendant advised Tuttle that "you won't find that here in Washington" but "where you will find it is in Baltimore", Maryland, "in Patterson, Eastern Avenue area." According to the defendant "that's where you find 10, 11, 12, 13, 14 year old boys." The defendant told Tuttle that if he would give the defendant "a couple of extra days notice or something like that" he might "head into Baltimore and pick up someone." He further noted that "these tricks go for ... 5, or 6 bucks a trick."

7. The defendant further advised Tuttle that he had "connections" in Baltimore and that "that's what Baltimore is all about—that's where you're going to find 'em." He noted that he has "connections" and "friends" in the Baltimore area and they "know where the kids are." He then informed Tuttle that "I can pretty much arrange that, uh, I just need some sort of notice when you are coming into town." The defendant again referred to the number Tuttle could call and noted he, defendant, could "head into Baltimore and see what I can find." He also expressed regret that nothing could be "arranged" at that time.

8. As the conversation continued, the defendant asked Tuttle what type of sex Tuttle wanted from the boys and they discussed that subject. Defendant further described the going price for boys in Baltimore, that most of the boys are not bad and that most are found in arcades. They also discussed other places for finding young boys including "malls" and Hagerstown.

9. The defendant again advised Tuttle that he needed some advance notice when Tuttle wanted a boy "so I can go into Baltimore" and he again referred to his "connections." When Tuttle indicated that he was not interested in learning who the defendant was dealing with, the defendant stated that "I know one guy that hangs out

at the Naples that uh, likes that age group." However, when Tuttle asked for a name, the defendant stated he could not remember the name.

10. The conversation reflected in findings of fact 3 through 9 was recorded on a body recorder and is contained on a tape (Govt. Exhibit 4) and has been transcribed (Govt. Exhibit 3).

11. Tuttle called the defendant at 703/684–7190, 1352 28th Street South, Arlington, Virginia, at 7:05 p.m. on March 9, 1982. The defendant was not in but Tuttle left a message that he was arriving in Washington the following day and would be staying at the Hyatt Regency. This call was also taped and transcribed.

12. The defendant telephoned Tuttle at the Hyatt Regency, Washington, D. C., at 7:50 p.m. on March 10, 1982. Tuttle identified himself as the one from Florida. Defendant then stated "I got you, not a person but I've, I've got a friend that can help you in that area." For the first time he referred to "Tim", Tim being the codefendant, Timothy McNamara. He described Tim as handling "that age group", meaning pre-pubescent boys.

13. At this point Tuttle expressed concern that Tim understood that Tuttle wanted to be very discreet. The defendant explained to Tuttle that Tim would be very discreet, that Tuttle would have no problem in calling Tim and that Tuttle should tell Tim that the defendant said to call him.

14. The defendant had previously spoken with Tim and discussed Tuttle and Tuttle's desire to obtain young boys for sexual purposes. Tim, in turn, had requested that the defendant give Tuttle Tim's phone number so that Tuttle could call Tim directly.

15. The defendant requested that Tuttle call Tim and "see what he has to say." He then stated that "like *I* say *we* need uh, *we* need a little bit of notice." It was agreed that Tuttle would call McNamara but if McNamara could not help him, Tuttle would call the defendant.

16. When Tuttle asked about prices the defendant noted that McNamara "will basically be handling that" but then went on to state "let me at least explain Timmy's [McNamara] side of it." He also stated that McNamara knows most of the kids in the Baltimore and Hagerstown area. The defendant then explained that the kids are "five and ten dollar tricks" and when Tuttle said that he did not want "the street urchin without shoes", the defendant responded "these are top notch kids, believe me." Immediately thereafter, the defendant noted "I hope these phones are not bugged." A few moments later the defendant stated "I just don't trust the phones here" and noted that the phones could be tapped.

17. The defendant was familiar with McNamara's method of operation and noted that he would probably give the kid "the 20 spotter" and keep the rest.

18. The conversation which is referred to in findings of fact numbered 12 through 17 is contained on a tape (Govt. Exhibit 5) and has been transcribed (Govt. Exhibit 6).

19. The Court finds that after the initial conversation between the defendant and Tuttle on February 17 and 18, 1982, the defendant discussed Tuttle's request with McNamara with a view to finding a pre-pubescent boy who could be delivered to Tuttle for a price; the boy was to be used by Tuttle for sexual purposes. The defendant and McNamara were in agreement that the boy or boys could be picked up in Baltimore and possibly Hagerstown.

20. The Court finds that the defendant was well aware of McNamara's method of operation and infers that this was not the first time the defendant and McNamara engaged in such activity. Moreover, it is quite clear that the defendant was quite concerned with the possibility of police intervention.

21. Tuttle made a telephone call to McNamara on March 10, 1982 at 8:08 p. m. and left a message upon learning that McNamara was not available. He told the unidentified person who answered the phone that he, Tuttle, was a friend of the defendant identifying the defendant simply

as "Phil". This call was recorded and later transcribed.

22. Tuttle made a telephone call to the defendant at 8:25 p. m. on March 10, 1982 to advise the defendant that he had attempted to reach McNamara but had been unsuccessful. The defendant suggested that he could furnish Tuttle with a 17 year old boy but Tuttle refused stating "I really don't care for the big guys with hair."

23. Tuttle inquired about arrangements for the following day and the defendant commented that "I should first get a hold of Tim." He noted that McNamara was the one who really knew where the young boys can be found.

24. Tuttle advised the defendant that March 11 would be his last time in Washington "for quite awhile" and the defendant responded "all right, I'll see what I can do with Timmy."

25. The telephone conversation made at 8:25 p. m. on March 10, 1982 was recorded and is on tape (Govt. Exhibit 5) and has been transcribed (Govt. Exhibit 7).

26. Tuttle telephoned McNamara at 9:25 p. m. on March 10, 1982, but the unidentified person who answered the phone advised him that McNamara was not available. The conversation was recorded and is now transcribed.

27. Tuttle telephoned McNamara at 4:16 p. m. on March 11, 1982. He advised McNamara that he was a friend of the defendant, Tuttle asked McNamara "has Phil [the defendant] told you about me" to which McNamara replied "yeah". Then Tuttle asked "without getting into any specifics, uh, can you help me out tonight." At no time up to this point had Tuttle described what he wanted or that he was seeking the services of young boys for sexual purposes.

28. Notwithstanding the fact that Tuttle had not described what he wanted, McNamara already knew what he wanted and advised Tuttle that the trip is an "hour up and an hour back" because he would have to go "all the way up to Baltimore."

29. Tuttle and McNamara then discussed the time problem in furnishing Tuttle with a boy and the possibility of McNamara furnishing Tuttle with more than one boy. They also discussed what the boy would be expected to do. At one point Tuttle noted that the defendant wanted to send him a "17 year old go go boy" but he told McNamara that he did not want that. Much of the rest of the conversation related to the logistics of bringing the boy from Baltimore to Washington or Tuttle going to Baltimore.

30. Tuttle and McNamara then discussed money and payment for the boy. McNamara indicated that the cost would be "a couple hundred." Tuttle asked about the defendant's share and McNamara responded "I've already talked about him, about that he doesn't want anything."

31. The conversations referred to in findings of fact numbered 26 through 30 were recorded on tape (Govt. Exhibit 9) and have been transcribed (Govt. Exhibit 8).

32. Tuttle called McNamara at 4:55 p. m. on March 11, 1982 to discuss arrangements for picking up a boy and delivering a boy to Tuttle's hotel room at the Washington Hilton Hotel in Washington, D. C. This conversation was recorded on a tape (Govt. Exhibit 10) and has been transcribed (Govt. Exhibit 11).

33. The defendant telephoned Tuttle on March 11, 1982, but Tuttle was not in his room and the defendant left a message for Tuttle to return the call. Tuttle returned that call at 10:56 p. m. on the same date. The defendant told Tuttle that he had spoken with McNamara and Tuttle advised him that he and McNamara had things worked out. The defendant replied "OK, fine, uh, then I'm out of the picture * * * basically, that's really the way I'd rather have it." The defendant asked whether Tuttle had McNamara's work phone number and Tuttle replied in the affirmative.

34. The defendant advised Tuttle that he had set other friends up and he doesn't really ask for anything and that he wanted nothing. He admitted that he and McNamara had discussed payment for the defendant but he said he did not want any-

thing. The defendant stated that "as far as I'm concerned, I'm out of the picture and that's fine with me."

35. The telephone conversation referred to in findings of fact numbered 33 and 34 were recorded on a tape (Govt. Exhibit 12) and has been transcribed (Govt. Exhibit 13).

36. The tape recordings have not been altered or changed or enhanced in any way and contain the complete and actual conversations of the speakers. Except for minor and insignificant changes noted during the trial when the tapes were being played, the transcripts accurately reflect the conversations recorded on the tapes.

37. Pursuant to the above conversations and meetings and agreements between Tuttle and the defendant, Tuttle and McNamara and the defendant and McNamara, McNamara went to Baltimore on March 14, 1982 and picked up a 12 year old boy, John, who lives in that city. The boy was transported to Washington by cab without the knowledge of his parent and was transported for delivery to Agent Tuttle. The purpose of delivering the boy to Agent Tuttle was so that he could engage in prohibited sexual activities with Agent Tuttle pursuant to Tuttle's request and the understanding of the defendant and McNamara. Prior to leaving Baltimore, McNamara called Tuttle to advise him that he had the boy and that he was ready to return to Washington. McNamara then went by cab from Baltimore to the Washington Hilton Hotel on Connecticut Avenue in Washington, D. C. When he arrived at the hotel he called Tuttle from the lobby to advise Tuttle that he and the boy were in the lobby. Tuttle went to the lobby, met McNamara and the boy, and they accompanied him to Tuttle's room. Once in the room they discussed money and Tuttle made sure, by asking McNamara, that the boy knew the purpose for his being delivered to the room. Tuttle then paid McNamara $300 in marked Government funds. Of this amount McNamara gave John the sum of $20 to pay for his services and to pay his way back to Baltimore. McNamara extracted a promise from Tuttle that Tuttle

would see to it that the boy was placed on the bus that would transport him back to Baltimore from Washington.

38. There is no evidence that the defendant knew the name of the actual boy who would be transported from Baltimore to Washington by McNamara. It is clear however that the defendant fully anticipated and expected that McNamara would transport a pre-pubescent boy from Baltimore to Washington and deliver that boy to Tuttle's hotel room so that Tuttle could engage in illegal sexual activities with the boy.

39. At the time that the defendant engaged in the conversations with Tuttle and at the time McNamara engaged in the conversations with Tuttle and actually delivered the boy to Tuttle's room, neither the defendant nor McNamara knew anything about Tuttle other than the fact that he was an out of town business man from Florida.

40. There is no evidence that the defendant received any type of compensation from Tuttle or McNamara for his involvement in the case.

41. The defendant remained in contact with Tuttle on all of the dates in question, including March 11, 1982, to insure that Tuttle gained the services of a pre-pubescent boy as Tuttle had requested.

42. Tuttle was able to meet with McNamara and secure the services of McNamara in obtaining the services of a pre-pubescent boy for sexual purposes through the efforts of the defendant and the defendant acted to ensure that Tuttle received the services he requested.

43. There is no evidence that the defendant knew the specific time or date on which the boy was to be delivered to Tuttle.

44. The criminal venture in this case was procuring the services of a pre-pubescent boy to engage in sexual acts for pay with undercover officer Tuttle and to secure the transportation of that boy from Baltimore to Washington, D. C. across state lines in interstate commerce. The defendant knowingly associated himself with that

criminal venture with the intent that the minor transported would engage in prohibited sexual conduct with the undercover officer.

45. John was a minor as that term is used in 18 U.S.C. § 2423 in that John was 12 years of age.

46. John was transported by McNamara to Tuttle for the purpose of engaging in prohibited sexual conduct, said conduct to include oral genital and anal genital contact between the undercover agent and the minor, John.

47. McNamara engaged in this conduct for purposes of commercial exploitation of the minor for financial gain.

## II

■ The defendant is charged under 18 U.S.C. § 2 as an aider and abettor, and that statute combines the classifications of an accessory before the fact and aider and abettor. *United States v. Molina*, 581 F.2d 56, 61, n. 8 (2d Cir. 1978). In order to establish its case, the Government must prove beyond a reasonable doubt that (1) the defendant had "the specific intent to facilitate the commission of a crime by another . . .; (2) guilty knowledge on the part of the accused; (3) that an offense was being committed by someone; and (4) that the accused assisted or participated in the commission of the offense." *United States v. Raper*, 676 F.2d 841, at 849 (D.C.Cir. 1982) (citations omitted).

Based on the Court's findings of fact, Part I, *supra*, the Court finds that the following facts have been established beyond a reasonable doubt. First, the defendant knew that Tuttle was seeking the services of a pre-pubescent boy; certainly a boy under the age of 18 years of age. Indeed, both Tuttle and the defendant spoke of "hairless" boys and boys in the age range of 10 to 14 years of age. Second, the defendant knew that Tuttle wanted a boy for "prohibited sexual conduct". He and Tuttle specifically discussed the sexual acts that Tuttle expected of the boy. Third, the defendant knew that boys in that age group could not be found in Washington, D. C.

and he so advised Tuttle. He told Tuttle that such boys could be obtained in Baltimore or Hagerstown and he mentioned the Patterson Park, Eastern Avenue area of Baltimore as an area where they could be found. Fourth, he knew and understood that Tuttle would be paying for the delivery of the boy to his hotel room and would pay for the boy's services. Fifth, he knew that McNamara could procure the boy in Baltimore and transport the boy to Washington and that McNamara would receive payment for delivery of the boy to Tuttle and that McNamara would in turn pay the boy for his sexual services. Sixth, the defendant had a guilty conscience. On several occasions he referred to either the need to be careful, the possibility that the phones may be bugged, the fact that the police were "cracking down" on such activities, and attempting to "get those bars" near the convention center.

Thus, it is clear that the defendant knew exactly what was involved and that such activities were in violation of the law. His knowledge of these facts and those described in Part I, *supra* demonstrate beyond a reasonable doubt that the defendant knew that he was violating the law as contained in 18 U.S.C. § 2423. But, that is not the end of the defendant's involvement.

The Court further finds beyond a reasonable doubt that, after his initial conversation with Tuttle on February 17 and 18, 1982, the defendant spoke with McNamara to arrange to furnish a boy to Tuttle on Tuttle's next trip to the District of Columbia. The defendant spoke with McNamara, acquainted him with Tuttle's request and took necessary steps to have McNamara supply a boy for Tuttle, if and when Tuttle returned to the city. When Tuttle had his initial conversation with McNamara, McNamara already knew what Tuttle wanted; that he was interested in performing prohibited sexual acts with a pre-pubescent boy, and that he was willing to pay for such services. In the first few seconds of Tuttle's 4:16 p. m.—March 11, 1982 conversation with McNamara, the latter, before Tuttle had made any request, stated that the

trip to Baltimore would be an hour each way. Moreover, Tuttle informed McNamara that he was a "friend of Phil's", referring to the defendant. Of course, it was the defendant who gave Tuttle McNamara's telephone number.

Even after Tuttle had made contact with McNamara, that did not end the defendant's interest and involvement in participating and attempting to supply a boy for Tuttle. The defendant called Tuttle on March 11, 1982 at 10:56 p.m. to ensure that Tuttle and McNamara had worked out their plans and only after learning that they had done so he indicated "*then* I'm out of the picture."

Although the defendant initially informed Tuttle that he did not know McNamara that well, the evidence establishes beyond a reasonable doubt that he knew and understood McNamara's method of operation, how he paid the boys, how much he paid the boys, and where he found the boys for use in such illicit enterprises.

■ Finally, the Government has established beyond a reasonable doubt that the defendant remained actively involved in securing a boy for Tuttle and that he continued his participation at least up to March 11, 1982, in order to make the plan succeed. The Court finds beyond a reasonable doubt that the defendant knowingly and willingly associated himself with the criminal venture with the specific intent to commit the crime, that he participated in it as something he intended to bring about and that he sought by his own action to make it succeed. *See* District of Columbia Criminal Jury Instructions 4:02.

### III

Notwithstanding the undisputed facts in this case, the defendant argues that the Court should grant his motion for judgment of acquittal because, conceding those facts, he cannot be an aider and abettor under 18 U.S.C. § 2. He contends that his involvement in the incident is insufficient to make him an aider and abettor, that he never participated in the actual crime and that there is no evidence that he knew the iden-

tity of the boy to be brought from Baltimore or when the boy was to be delivered, and finally, that in any event, he withdrew from the criminal venture before it took place.

■ As to the argument that he withdrew from the enterprise, the Court finds little merit. While it is true that there is no evidence that he received money for his participation in the venture and that on March 11, 1982, he told Tuttle that he was "out of the picture", his "withdrawal" came *only* after he satisfied himself that his active participation was no longer required to assure that the criminal venture would succeed; that is, to assure that Tuttle would receive delivery of a young boy to satisfy his sexual demands. Indeed, not only did he call Tuttle on March 11, he also had spoken with McNamara on or about the same day. There is no evidence that he ever changed his mind concerning his involvement in the venture, and when the crime was completed, it was completed based upon the forces the defendant had placed in motion; the crime was not committed as a result of any new or intervening cause. *See* 21 Am.Jur.2d *Criminal Law* § 173 (1981). In short, it is clear that there was no abandonment of the criminal enterprise. *See Commonwealth v. Mangula*, 2 Mass.App. 785, 322 N.E.2d 177, 182 n. 6 (1975). His contention that he withdrew from the criminal venture is totally without merit and must be rejected.

■ The contention that he did not know the name of the boy in question is likewise without merit and must therefore be rejected. The name of the boy is not an essential element of the offense; what must be proved beyond a reasonable doubt is that the boy was under 18 years of age, that he was to be transported in interstate commerce, that he was to be transported for prohibited sexual conduct, and that he was to be commercially exploited. All of the above facts have been established beyond a reasonable doubt and represent the defendant's agreement or promise to Tuttle. There is no requirement that an aider or

abettor know every last detail of the substantive offense. 21 Am.Jur.2d *Criminal Law* § 167 (1981). Additionally, it is noted that there is no requirement that the defendant receive a financial benefit before he may be held as an aider or abettor. *See United States v. Manna*, 353 F.2d 191, 192–193 (2d Cir. 1965).

## IV

The defendant's final contention is that his involvement is legally insufficient to hold him as an aider and abettor.

As is noted earlier, 18 U.S.C. § 2 includes the two classifications of accessory before the fact and the common law crime of aiding and abetting. That section reads in part:

> (a) Whoever commits an offense against the United States or aids, abets, counsels, commands, induces, or procures its commission, is punishable as a principal.

There can be no dispute that the defendant, after his conversation with Tuttle, contacted McNamara and by his actions induced and procured the commission of the crime. He put Tuttle in contact with McNamara but did not stop at that point. He called McNamara, advised him about Tuttle and vouched for Tuttle. He told McNamara what Tuttle was looking for so that when Tuttle finally reached McNamara, the latter knew exactly what was expected. He requested Tuttle to give them more notice so that they could make the arrangements to transport a young pre-pubescent boy from Baltimore to Washington. It was the defendant who obtained the initial information as to what Tuttle wanted and he discussed price and the problems of procuring young boys. He also advised Tuttle as to McNamara's way of doing business and continued to assure Tuttle that the matter could be handled in a very discreet manner. The defendant did not merely give Tuttle a name to contact, he followed through and satisfied himself that Tuttle had been taken care of. Clearly then, the defendant induced and procured the commission of the offense by his own actions; and having

done so is punishable as a principal under 18 U.S.C. § 2.

The facts in this case are not unlike those in *United States v. Manna, supra*. There, the defendant was approached by an undercover agent who sought to purchase drugs from him. Manna sent the agent to Ray with a message that he, Manna, wanted Ray to take good care of the agent. Ray made the sales, but reluctantly and apparently only because of Manna's request. There was no showing that Manna received any financial remuneration from either the agent or Ray, nor was he present at the transactions nor shown to have any personal contact with Ray in connection with the sales. The Court nevertheless found that the evidence was sufficient to sustain the conclusion that Manna was an aider and abettor.

The court in *Manna* noted that "[h]e had sufficient ability, influence and control here to bring about a sale that, without his participation, would not have been made." 353 F.2d at 192.

■ The same is true in the instant case. This is not a case of a mere referral by the defendant; rather, he actively involved himself in the criminal endeavor by maintaining contact with Tuttle and by assuring Tuttle throughout that the arrangements would be discreet and by satisfying Tuttle that such arrangements could indeed be made. On the other side, he advised McNamara and vouched for Tuttle and conveyed Tuttle's request to McNamara. Under these circumstances the Court is satisfied, both factually, beyond a reasonable doubt, and legally, that the defendant was an aider and abettor as defined in 18 U.S.C. § 2. Of course, the Court has already found McNamara guilty of the substantive offense.

Having so found, it follows that the defendant's motion for judgment of acquittal must be denied, and upon consideration of all the evidence and the arguments of counsel, the Court finds that the Government has established the essential elements of the offense beyond a reasonable doubt and ac-

**138**

cordingly, the Court finds the defendant guilty of Count 1 of the Indictment, aiding and abetting in transportation of a minor in interstate commerce for the purpose of prohibited sexual conduct for commercial exploitation.

Having taken into consideration all the evidence and the arguments made on the motion for judgment of acquittal, it is hereby

ORDERED that the defendant's motion for judgment of acquittal, both at the close of the Government's case and at the close of the entire case is denied, and it is further

ORDERED the Court having found that the Government has established its case beyond a reasonable doubt, that the defendant is guilty of the charge of aiding and abetting in transportation of a minor in interstate commerce for the purpose of prohibited sexual conduct for commercial exploitation.