**UNITED STATES of America**

v.

**Philip H. GARRETT, Appellant.**

**UNITED STATES of America**

v.

**Timothy M. McNAMARA, Appellant.**

**Nos. 82–1812, 82–1849.**

United States Court of Appeals,
District of Columbia Circuit.

Argued Jan. 18, 1983.

Decided Nov. 4, 1983.

Certiorari Denied Feb. 21, 1984.
See 104 S.Ct. 1311.

Richard S. Stolker and John P. Dean, Washington, D.C. (appointed by the Court) for appellants.

Robert K. Reed, Asst. U.S. Atty., Washington, D.C., with whom Stanley S. Harris, U.S. Atty., Michael W. Farrell and Theodore A. Shmanda, Asst. U.S. Attys., Washington, D.C., were on brief, for appellee.

Before WILKEY and BORK, Circuit Judges, and McGOWAN, Senior Circuit Judge.

Opinion for the Court filed by Circuit Judge BORK.

BORK, Circuit Judge:

In these consolidated appeals we first consider whether the district court should have dismissed the indictment against appellant McNamara under the Speedy Trial Act, 18 U.S.C. § 3161 *et seq.* (1976), because it was filed thirty-one days after he was arrested. Second, we must decide whether there was sufficient evidence to support appellant Garrett's conviction for aiding and abetting the interstate transportation of a minor for the purpose of commercial and sexual exploitation in violation of 18 U.S.C. §§ 2 and 2423 (1976). We affirm both convictions.

I.

Timothy M. McNamara was arrested on March 14, 1982 for unlawful interstate

transportation of a minor for purposes of prohibited sexual conduct for commercial exploitation. *See* 18 U.S.C. § 2423 (1976). The appropriate papers were delivered to the United States Attorney the next day, March 15, 1982, and the complaint was filed. Also on March 15, 1982, a warrant was issued for Philip H. Garrett and he was arrested. McNamara was brought before a magistrate and released on his own recognizance. A preliminary hearing was held on March 29, 1982, and the magistrate found probable cause to bind McNamara over to the grand jury. The magistrate continued McNamara's release on his own recognizance, with the additional condition that he stay away from three locations, including the Naples Cafe.

On April 1, 1982, the FBI was informed that McNamara had been seen in the Naples Cafe. Four days later, a "reliable confidential source" reported to the FBI that McNamara had again been in the Naples Cafe. Government Appendix ("G.A.") at G4. At that time, McNamara was overheard telling patrons that his bond would be revoked if he were caught in the cafe but that because the local police were unaware of the conditions of the bond, he need only be on the lookout for the FBI. *Id.* On the strength of the informant's affidavit, the FBI sought and obtained a bench warrant for McNamara's arrest. The warrant was issued on April 6, 1982 and executed on April 8, 1982. On April 8, 1982, a bail hearing was held by the magistrate, McNamara's personal recognizance bond was revoked, and he was committed to jail with bail set at $10,000. The district court found that "at least one day, and probably two days ... [were] taken up by the[se] efforts of the United States Attorney ...." *Id.* at G5.

Evidence in these cases was presented to a special grand jury on three separate days. The grand jury returned an indictment on April 14, 1982. One count charged McNamara with the substantive offense for which he had been arrested; a second count charged Garrett with aiding and abetting the same offense.

The Speedy Trial Act, 18 U.S.C. § 3161 *et seq.* (1976), establishes time limits for both pre-indictment and post-indictment phases of a criminal proceeding. Section 3161(b)—which applies to pre-indictment delay—states that an indictment "shall be filed within thirty days from the date on which [the defendant] was arrested or served with a summons ...." If that deadline is not met, the charge contained in the complaint "shall be dismissed or otherwise dropped." 18 U.S.C. § 3162(a)(1). Dismissal is mandatory. *United States v. Bittle,* 699 F.2d 1201, 1203 (D.C.Cir.1983). There are, however, several statutory "exclusions" which toll the filing period. *See* 18 U.S.C. § 3161(h).

McNamara moved to dismiss the indictment on April 23, 1982, because it was not returned within the thirty-day period. He argued that, after excluding from the computation, pursuant to Federal Rule of Criminal Procedure 45(a), the day on which he was arrested, and beginning the thirty-day count on March 15, 1982, the indictment was returned thirty-one days following his arrest. The district court denied the motion and ruled the indictment timely by excluding certain periods from the computation of the filing period under 18 U.S.C. § 3161(h)(3) or § 3161(h)(7). G.A. at G5. McNamara was subsequently convicted.

We believe that the district court properly excluded a day from the time period but did so on an inapplicable ground. Section 3161(h)(3), one of the provisions relied upon, requires that "[a]ny period of delay resulting from the absence or unavailability of the defendant" be excluded from the relevant computation. "[A]bsence" and "unavailability" are expressly defined by the statute. An exclusion under this section is proper (1) when the defendant's "whereabouts are unknown, and, in addition, he is attempting to avoid apprehension or prosecution or his whereabouts cannot be determined by due diligence," or (2) when the defendant's whereabouts are known, but his "presence for trial cannot be obtained by due diligence or he resists appearing at or being returned for trial." 18 U.S.C.

§ 3161(h)(3)(B). The lower court found that, when McNamara violated the conditions of his bond, his whereabouts "could be considered to be uncertain because [he] knew he was violating the [magistrate's] order and took necessary steps to avoid apprehension by the FBI." G.A. at G5. Accordingly, "at least one day, and probably two days are excludable since that time was taken up by the efforts of the United States Attorney and the FBI agent to secure a Bench Warrant for the defendant's arrest, to apprehend him, to bring him before the Magistrate, and [to] secure his appearance for future proceedings." *Id.*

Reliance on section 3161(h)(3) to exclude the delay was misplaced. At no time during the pre-indictment period were McNamara's whereabouts unknown. While his visits to the Naples Cafe constituted a serious breach of the magistrate's order, we cannot equate "unavailability" with the intentional violation of a judicial decree. Absent some specific indication of congressional intent to the contrary, the statutory text controls. *See generally Bread Political Action Committee v. Federal Election Commission,* 455 U.S. 577, 580–81, 102 S.Ct. 1235, 1237–38, 71 L.Ed.2d 432 (1982); *Griffin v. Oceanic Contractors, Inc.,* 458 U.S. 564, 102 S.Ct. 3245, 73 L.Ed.2d 973 (1982). The defendant did not "resist[ ] appearing at or being returned for trial." Nor was there any indication that McNamara's "presence for trial cannot be obtained by due diligence." It is not enough that "the FBI had reason to believe that they might not be able to locate the defendant especially if he knew that they had knowledge of his deliberate violation of the Magistrate's order." G.A. at G5.

■ As an alternate to excluding time under section 3161(h)(3), the trial court not-

ed that because Garrett—McNamara's co-appellant—was not arrested until March 15, 1982, the relevant thirty-day period for him began to run on March 16, 1982. Citing section 3161(h)(7), which requires exclusion of "[a] reasonable period of delay when the defendant is joined for trial with a codefendant as to whom the time for trial has not run and no motion for severance has been granted," the court reasoned:

> Since two persons were allegedly involved in the commission of the offense, it is reasonable to conclude that the time did not commence to run until March 16, 1982 for both defendants, for at that point the Government was in a position to assert charges against both and to present those matters to the Grand Jury.

G.A. at G5.

This exclusion, however, does not apply here. Section 3161(h)(7) operates only to exclude delay occurring in the second phase of a criminal prosecution—the time between indictment (or initial presentation) and trial. The text excludes delay "when the defendant is *joined for trial* with a codefendant as to whom *the time for trial has not run,*" 18 U.S.C. § 3161(h)(7) (emphasis added), and we have found no case which applies this exclusion to pre-indictment delay.[1]

Nor have we discovered any other authority which suggests that the scope of this exclusion should be expanded to reach periods of delay in the pre-indictment phase of a criminal proceeding. The legislative history of the Act supports the more restrictive reading. Congress was concerned about the Speedy Trial Act's impact on government efforts to prosecute multidefendant cases. The exclusion in section 3161(h)(7) addressed this concern and was

---

1. Courts that have invoked section 3161(h)(7) to exclude a period of delay from a computation have done so only with respect to delay in bringing a defendant to trial in compliance with 18 U.S.C. § 3161(c). *See, e.g., United States v. Campbell,* 706 F.2d 1138 (11th Cir.1983); *United States v. Horton,* 705 F.2d 1414 (5th Cir. 1983); *United States v. Varella,* 692 F.2d 1352 (11th Cir.1982), *cert. denied,* —— U.S. ——, 103 S.Ct. 3542, 77 L.Ed.2d 1392 (1983); *United*

*States v. Davis,* 679 F.2d 845 (11th Cir.1982); *United States v. Barton,* 647 F.2d 224 (2d Cir.), *cert. denied,* 454 U.S. 857, 102 S.Ct. 307, 70 L.Ed.2d 152 (1981); *United States v. Edwards,* 627 F.2d 460 (D.C.Cir.), *cert. denied,* 449 U.S. 872, 101 S.Ct. 211, 66 L.Ed.2d 92 (1980); *United States v. McGrath,* 613 F.2d 361 (2d Cir. 1979), *cert. denied,* 446 U.S. 967, 100 S.Ct. 2946, 64 L.Ed.2d 827 (1980).

intended to avoid forcing the government to seek severance in a multidefendant trial due solely to the Act's time limitations. "[T]he purpose of the provision is to make sure that [the Speedy Trial Act] does not alter the present rules on severance of codefendants by forcing the Government to prosecute the first defendant separately or to be subject to a speedy trial dismissal motion under section 3162." S.Rep. No. 1021, 93d Cong., 2d Sess. 38 (1974). The exclusion accomplishes this goal "because it provides that *an exclusion* applicable to one defendant applies to *all* defendants." *United States v. Edwards,* 627 F.2d 460, 461 (D.C.Cir.), *cert. denied,* 449 U.S. 872, 101 S.Ct. 211, 66 L.Ed.2d 92 (1980) (emphasis added). *See also United States v. Campbell,* 706 F.2d 1138, 1141–42 (11th Cir.1983); *United States v. Varella,* 692 F.2d 1352, 1359 (11th Cir.1982), *cert. denied,* —— U.S. ——, 103 S.Ct. 3542, 77 L.Ed.2d 1392 (1983) ("reasonable delay in multi-defendant cases was specifically provided for by 18 U.S.C. § 3161(h)(7)"). The concern articulated by Congress and addressed specifically in section 3161(h)(7) is not present in this case.[2]

■ In this case, however, the delay occasioned by McNamara's bond violation and subsequent bail hearing is properly excludable under the general and nonexclusive language of section 3161(h)(1). That provision directs a court to exclude from the computation of time limits "[a]ny period of delay resulting from other proceedings concerning the defendant, including *but not limited to* ..." the delay caused by the specific proceedings listed in subparts (A) through (J) (emphasis added).[3] The list of "other proceedings", as this language shows, is merely illustrative and not intended to be exhaustive. There is "undoubtedly a degree of discretion involved in ascertaining the nature of *those proceedings* which fall within the 'other proceedings' language of

---

**2.** This interpretation of section 3161(h)(7) is consistent with the Judicial Conference's *Guidelines to the Administration of the Speedy Trial Act of 1974, as Amended.* The *Guidelines* are not, of course, binding, *id.* at i; *see also United States v. Campbell,* 706 F.2d at 1142 & n. 7; nonetheless, they represent the considered and experienced judgment of various members of the judicial branch and as such deserve consideration in construing the Act. The *Guidelines* suggest starting and ending dates for calculating delay under the subsection (h)(7) exclusion. In doing so, they refer exclusively to "the day that would otherwise have been the last day for commencement of trial ..., the latest permissible day for commencement of trial ... [and] the date on which severance is granted [or] the codefendant pleads guilty." *Guidelines* at 53. These dates are clear references to the time period following the indictment and preceding the defendant's trial. No other dates are mentioned.

**3.** 18 U.S.C. § 3161(h)(1) (1976) requires exclusion, from the computation of time limits, of:

Any period of delay resulting from other proceedings concerning the defendant, including but not limited to—

(A) delay resulting from any proceeding, including any examinations, to determine the mental competency or physical capacity of the defendant;

(B) delay resulting from any proceeding, including any examination of the defendant, pursuant to section 2902 of title 28, United States Code;

(C) delay resulting from deferral of prosecution pursuant to section 2902 of title 28, United States Code;

(D) delay resulting from trial with respect to other charges against the defendant;

(E) delay resulting from any interlocutory appeal;

(F) delay resulting from any pretrial motion, from the filing of the motion through the conclusion of the hearing on, or other prompt disposition of, such motion;

(G) delay resulting from any proceeding relating to the transfer of a case or the removal of any defendant from another district under the Federal Rules of Criminal Procedure;

(H) delay resulting from transportation of any defendant from another district, or to and from places of examination or hospitalization, except that any time consumed in excess of ten days from the date an order of removal or an order directing such transportation, and the defendant's arrival at the destination shall be presumed to be unreasonable;

(I) delay resulting from consideration by the court of a proposed plea agreement to be entered into by the defendant and the attorney for the Government; and

(J) delay reasonably attributable to any period, not to exceed thirty days, during which any proceeding concerning the defendant is actually under advisement by the court.

the statute." *United States v. Lopez-Espindola,* 632 F.2d 107, 110 (9th Cir.1980) (emphasis in original).

Congress articulated its intent that the "other proceedings" language be read broadly. The 1974 Senate Report states that "enumerated in the text of the bill [are] *examples* of what is meant by 'proceedings concerning the defendant.'" S.Rep. No. 1021, *supra,* at 36 (emphasis added). The list, according to Congress, is "not intended to be exhaustive." *Id. See also Hearings on S. 754, H.R. 7873, H.R. 207, H.R. 658, H.R. 687, H.R. 773, and H.R. 4807 Before the Subcomm. on Crime of the House Comm. on the Judiciary,* 93d Cong., 2d Sess. 400 (1974). The Senate Report accompanying the 1979 amendments to the Act reinforces this conclusion:

> Thus, the Congress, with the active cooperation of the Department of Justice and other interested parties, made a conscientious effort to set forth with reasonable particularity the types of delay which, it hoped, would be excluded as a matter of practice consistent with the objectives to be served by the Act. Modifications made to serve that end were substantial following the introduction of the Act's legislative predecessors. Yet, by the same token, both *this Committee and its House counterpart took pains to forestall the possibility that a desire to be instructively particular not be misinterpreted as exclusively inflexible.*

S.Rep. No. 212, 96th Cong., 1st Sess. 10 (1979) (emphasis added). *See also* R. Misner, *Speedy Trial Federal and State Practice* 261–62 (1983). The Judicial Conference's *Guidelines* interpret "other proceedings" in a similar vein, including within that clause preliminary examinations under Rule 5.1, arraignment proceedings, pretrial conferences, depositions under Rule 15, and, of particular significance here, bail hearings. *Guidelines* at 44. Finally, as applied in the courts, the "other proceedings" clause has been interpreted to include probation revocation proceedings, *United States v. Lopez-Espindola,* 632 F.2d at 110, and the time during which a defendant is in state custody pending trial. *See United States v.*

*Goodwin,* 612 F.2d 1103, 1108 (8th Cir.), *cert. denied,* 446 U.S. 986, 100 S.Ct. 2971, 64 L.Ed.2d 844 (1980); *United States v. Allsup,* 573 F.2d 1141, 1144 (9th Cir.), *cert. denied,* 436 U.S. 961, 98 S.Ct. 3081, 57 L.Ed.2d 1128 (1978).

While the proceedings which caused the delay in this case—securing a bench warrant for McNamara and bringing him before the magistrate for revocation of bail—are not among those specified in the Act, they are clearly of the same type. Had the district court excluded the delay under the "other proceedings" clause, we would have had no difficulty sustaining the decision.

■ That neither the district court nor the government relied upon the exclusion provided by section 3161(h)(1) does not, of course, preclude us from doing do. It is well settled that "in reviewing the decision of a lower court, [that decision] must be affirmed if the result is correct 'although the lower court relied upon a wrong ground or gave a wrong reason.'" *SEC v. Chenery Corp.,* 318 U.S. 80, 88, 63 S.Ct. 454, 459, 87 L.Ed. 626 (1943) (quoting *Helvering v. Gowran,* 302 U.S. 238, 245, 58 S.Ct. 154, 158, 82 L.Ed. 224 (1937)). *See also United States v. Jodoin,* 672 F.2d 232, 238 (1st Cir.1982) ("[A]n appellate court must affirm a judgment of a district court if it is correct as a matter of law, even if for reasons other than those cited by the district court itself.").

In *Chenery,* the Court recognized that "where the correctness of the lower court's decision depends upon a determination of fact which only a [fact-finder] could make but which has not been made, the appellate court cannot take the place of the [fact-finder]." 318 U.S. at 88, 63 S.Ct. at 459. That is not the case here. The district court made explicit findings of delay and causation due to the proceedings to revoke McNamara's bond. In these circumstances, it would be useless to send the case back to the lower court merely "to reinstate a decision which it had already made but which [we] concluded should properly be based on another ground within [our] power ... to

formulate." *Id.* On appeal, we are within our "undoubted[ ] ... degree of discretion," *United States v. Lopez-Espindola*, 632 F.2d at 110, to exclude the delay. We do, and we hold McNamara's indictment timely.

## II.

### A.

Garrett was indicted for violating 18 U.S.C. § 2(a) (1976), which provides that "[w]hoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal." Consideration of Garrett's appeal requires an understanding of the criminal venture which he forwarded. On February 17, 1982, Federal Bureau of Investigation Special Agent M. Glenn Tuttle, pretending to be a Florida businessman, met Garrett near the Naples Cafe in the District of Columbia. Tuttle was investigating the sexual exploitation of children and during this initial conversation told Garrett that he was interested in obtaining a young boy for sexual purposes. At Garrett's suggestion, the two met the following evening at the Chesapeake Lounge, a gathering place for young male prostitutes, at which time Garrett tried to interest Tuttle in two older males. This and subsequent conversations and telephone calls between appellants and the Special Agent were tape recorded. During this conversation, Tuttle again indicated that he was interested only in prepubescent boys. Garrett said that such boys were difficult to obtain in the District due to police pressure but that they were available in the Baltimore area. However, Garrett also told Tuttle that if given "a couple of extra days notice" he might "head into Baltimore and pick someone up. According to Garrett, he had "friends" and "connections" in that area who "know where the kids are" and could arrange something. Appellant stated that he knew "one guy that hangs out at the Naples [Cafe] that ... likes that age group." The two also discussed, at Garrett's request, the type of sex Tuttle wanted and the going price for young boys in Baltimore.

On March 9, 1982, Tuttle telephoned the number given to him by Garrett. Garrett was not home. Tuttle identified himself and left a message that he was arriving in Washington the next day and would be staying at the Hyatt Regency hotel. The next night, Garrett telephoned Tuttle at the Hyatt and told him that he had "a friend that [could] help," referring to this friend as "Tim"—the coappellant Timothy McNamara. Garrett had apparently spoken to McNamara about Tuttle's desire to obtain young boys for sexual purposes and McNamara had instructed Garrett to have Tuttle call him directly. Garrett again reminded Tuttle that "we need a little bit of notice" and they agreed that Tuttle would call McNamara but that if he could not help, Tuttle would call Garrett back.

Tuttle then asked about prices. Garrett replied that McNamara would "be handling that" but because Garrett was familiar with the way McNamara had set up similar deals, he went on to explain "Timmy's side of it." The trial court found that the appellant was "well aware of McNamara's method of operation" and inferred that this was not the first time the two appellants had engaged in such activity. *United States v. Garrett*, 545 F.Supp. 129, 132 (D.D.C.1982).

Later that evening, Tuttle tried without success to contact McNamara. He then called Garrett who offered him the services of a 17-year-old male. Tuttle rejected the offer. He then asked Garrett about the possibilities for the following day. Garrett said that he first would have to "get a hold of Tim" because McNamara was the one who knew where the young boys could be found. After Tuttle said that the next day would be his last in Washington "for quite a while," Garrett stated "all right, I'll see what I can do with Timmy."

Tuttle finally reached McNamara by telephone on the afternoon of March 11, 1982. Identifying himself as a friend of Garrett, Tuttle asked McNamara whether "Phil told you about me," to which McNamara responded "Yeah." Despite the fact that Tuttle had not yet described what he want-

ed, McNamara indicated that he already knew. The two discussed the various timing problems associated with bringing a prepubescent boy from Baltimore to the District of Columbia and the possibility of McNamara providing Tuttle with more than one youth. They also discussed what the boy would be expected to do. When the conversation turned to money, Tuttle asked about Garrett's share. McNamara answered that he had spoken with Garrett and that Garrett "doesn't want anything."

Garrett and Tuttle had one final conversation on the evening of March 11, 1982. Tuttle told Garrett that he and McNamara had worked things out and Garrett replied "OK, fine, uh, then I'm out of the picture . . . basically, that's really the way I'd rather have it." Garrett also told Tuttle that he had set up other friends with McNamara in the past and that he did not ask for anything and wanted nothing for his services. While he admitted that he and McNamara had discussed payment, Garrett said that "as far as I'm concerned, I'm out of the picture and that's fine with me." Before the conversation ended, Garrett made sure that Tuttle had McNamara's work telephone number.

On March 14, 1982, McNamara transported a 12-year-old boy from Baltimore, Maryland to Special Agent Tuttle's hotel room in Washington, D.C. so that the boy could engage in prohibited sexual activities. In the hotel room, McNamara was paid $300 by Tuttle; of that amount, the boy was given $20. McNamara was arrested at that point and the next day Garrett was arrested for aiding and abetting.

After waiving his right to a jury trial, Garrett was tried to the court on a stipulated record consisting primarily of the transcript of McNamara's trial, including the testimony of Special Agent Tuttle and tape recordings of the conversations between Tuttle and the appellants. At the close of the government's case, the parties agreed that neither side would offer further proof and the court held lengthy arguments on Garrett's motion for judgment of acquittal. The parties stipulated that these arguments would also be taken as closing arguments on the merits. The parties agreed that the "primary issue [was], whether on the facts of this case, the defendant [Garrett] is an aider and abettor." 545 F.Supp. at 130.

The district court denied Garrett's motion for judgment of acquittal and convicted him of aiding and abetting the interstate transportation of a minor for the purpose of prohibited sexual conduct for commercial exploitation in violation of 18 U.S.C. §§ 2 and 2423 (1976). The court found beyond a reasonable doubt that Garrett had "knowingly and willingly associated himself with a criminal venture with the specific intent to commit the crime, that he participated in it as something to bring about and that he sought by his own action to make it succeed." 545 F.Supp. at 136. Garrett was sentenced to a term of imprisonment of 20 months to 5 years.

### B.

■ Garrett challenges his conviction on two grounds, each without merit. He argues first, that the evidence was insufficient for the court to find him guilty of aiding and abetting under 18 U.S.C. § 2. He notes that "he took no part in the selecting or transporting of the boy from Baltimore to Washington." Brief for Appellant Garrett at 6. Conceding that "he was aware of the plan," Garrett nonetheless argues that "he did not help design it, was not privy to the details, and performed no affirmative acts to carry it out." *Id.* at 7. Accordingly, the evidence at trial "was insufficient as a matter of law to establish participation in the offense charged." *Id.* at 6.

The factual assertions upon which Garrett rests his arguments may be accurate, but his legal conclusion does not follow. It is not necessary that Garrett have participated in all aspects of the crime in order to be convicted of aiding and abetting. *See, e.g., United States v. Hewitt,* 663 F.2d 1381, 1385 (11th Cir.1981); *United States v. Miller,* 552 F.Supp. 827, 830 & n. 7 (N.D.Ill.

1982).[4] 18 U.S.C. § 2 codified the common law relating to accessories, making one who "assists the perpetrator of the crime while sharing the requisite criminal intent" liable as a principal. *United States v. Schwartz,* 666 F.2d 461, 463 (11th Cir.1982); *see also United States v. Staten,* 581 F.2d 878, 886 (D.C.Cir.1978). The House Report accompanying the 1947 revisions to Title 18 "makes clear the legislative intent to punish as a principal not only one who directly commits an offense and one who 'aids, abets, counsels, commands, induces or procures' another to commit an offense, but also anyone who causes the doing of an act which if done by him directly would render him guilty of an offense against the United States." H.R.Rep. No. 304, 80th Cong., 1st Sess. A5 (1947). It "removes all doubt that one who puts in motion or assists in the illegal enterprise but [sic] causes the commission of an indispensable element by an innocent agent or instrumentality, is guilty as a principal even though he intentionally refrained from the direct act constituting the completed offense." *Id.*

To convict a defendant of aiding and abetting, the government need not show that the defendant participated in every phase of the criminal venture. *United States v. Hewitt,* 663 F.2d at 1385. Crimi-

nal accountability "does not depend inexorably upon personal performance of the [substantive elements] comprising an offense." *United States v. Staten,* 581 F.2d at 886. A culpable aider and abettor "need not perform the substantive offense, need not know its details, and need not even be present so long as the offense committed by the principal was in furtherance of the common design." *United States v. Sampol,* 636 F.2d 621, 676 (D.C.Cir.1980) (citations omitted); *see also United States v. Campbell,* 702 F.2d 262, 265 (D.C.Cir.1983).

■ In *United States v. Raper,* 676 F.2d 841 (D.C.Cir.1982), this court set out the elements of aiding and abetting an offense:

> (1) the specific intent to facilitate the commission of a crime by another, ... (2) guilty knowledge on the part of the accused; (3) that an offense was being committed by someone; and (4) that the accused assisted or participated in the commission of the offense.

*Id.* at 849 (citing *United States v. Staten,* 581 F.2d 878, 886–87 (D.C.Cir.1978); *United States v. Prince,* 529 F.2d 1108, 1112 (6th Cir.), *cert. denied,* 429 U.S. 838, 97 S.Ct. 108, 50 L.Ed.2d 105 (1976); *United States v. Wiley,* 492 F.2d 547, 551 (D.C.Cir.1973)). To sustain the defendant's conviction, "[a]ll that is necessary is to show some affirma-

---

4. Garrett argues, relying on *United States v. Jackson,* 526 F.2d 1236 (5th Cir.1976), that a conviction under 18 U.S.C. § 2 demands proof of the requisite degree of participation in each substantive and jurisdictional element of the underlying offense. In *Jackson,* the defendant was charged with, and convicted of, aiding and abetting the possession of cocaine with intent to distribute. The evidence showed that while Jackson had introduced one appellant to the second and that the two coappellants then sold cocaine to federal agents, he had never exercised control or dominion over the illegal drugs. The court struck down the conviction absent proof of "participation by [the defendant] in the possession aspect of the transaction." 526 F.2d at 1238. The court declared, however, that the evidence at trial would have been sufficient to sustain a conviction for aiding and abetting *distribution* of the cocaine "because of [the defendant's] overall participation in the criminal venture." *Id.* at 1237 (emphasis added).

A panel majority of this court has construed *Jackson* to hold merely that "one convicted of

aiding and abetting the crime of possession with intent to distribute must give the required statutory support to the *possession* element of the offense as well as the intent to distribute. This requirement can be satisfied by evidence of *any* of the acts specified in 18 U.S.C. § 2 ...." *United States v. Raper,* 676 F.2d 841, 850–52 n. 1 (D.C.Cir.1982) (emphasis in original). We are not confident that the scope of *Jackson* can be so restricted. *See, e.g., United States v. Fischel,* 686 F.2d 1082, 1087 (5th Cir. 1982). But to the extent that *Jackson* may stand for the proposition that 18 U.S.C. § 2 requires participation in each element of the substantive offense, it is contrary to the law of this circuit. We think *Jackson* ignores the breadth of the aiding and abetting statute. *See Raper,* 676 F.2d at 850. As we show in the text, "[a]ll that is necessary [to sustain a conviction under 18 U.S.C. § 2] is to show some affirmative participation which at least encourages the principal offender to commit the offense...." *Id.*

tive participation which at least encourages the principal offender to commit the offense, with all its elements, as proscribed by the statute." 676 F.2d at 850 (citations omitted).

The district court concluded that Garrett's participation in the criminal venture "establishe[s] the essential elements of the offense beyond a reasonable doubt ...." 545 F.Supp. at 137. A reading of the facts we have recited above demonstrates that this is the only conclusion that could possibly be drawn. As a heavily involved go-between, Garrett abundantly satisfied every element of the offense as specified in *Raper.*

Garrett's second contention is that, because he had voluntarily "withdrawn from the criminal venture ... 24 hours prior to the actual offense," he could not be convicted of aiding and abetting that offense. We agree with the district court that this argument is "totally without merit." 545 F.Supp. at 136. Garrett confuses abandonment of criminal purpose with the mere fact that his role in the criminal venture, the success of which he always intended, had come to an end. He never changed his mind regarding his involvement with McNamara and the "project" was successful in large part due to Garrett's efforts.

■ We have recited the legislative history of the aiding and abetting statute which shows that "one who puts in motion or assists in the illegal enterprise ... is guilty as a principal even though he intentionally refrained from the direct act constituting the completed offense." H.R.Rep. No. 304, *supra,* at A5. While there is little federal court authority on this "withdrawal" issue under 18 U.S.C. § 2, the law of conspiracy is closely analogous. *See United States v. Sampol,* 636 F.2d at 676 ("Liability under [an aiding and abetting] theory parallels that under the conspiracy theory.").

The decisions under that head make it clear that to establish an effective withdrawal, the defendant must show that he took affirmative action to defeat or disavow the purpose of the conspiracy. *See United States v. Phillips,* 664 F.2d 971, 1018 (5th Cir.1981), *cert. denied,* 457 U.S. 1136, 102 S.Ct. 2965, 73 L.Ed.2d 1354 (1982). The "[m]ere cessation of activity in furtherance of the conspiracy does not constitute withdrawal." 664 F.2d at 1018 (testimony that defendant had "broke[n] off relations completely" with co-conspirators did not constitute withdrawal as a matter of law). *See also Hyde & Schneider v. United States,* 225 U.S. 347, 369, 32 S.Ct. 793, 803, 56 L.Ed. 1114 (1912); *United States v. Smith,* 623 F.2d 627, 631 (9th Cir.1980) (withdrawal requires affirmative act to defeat purpose of conspiracy or " 'definite, decisive, and positive steps' " to disassociate with the venture); *United States v. Mardian,* 546 F.2d 973, 978 & n. 5 (D.C.Cir.1976) (withdrawal requires " 'either the making of a clean breast to the authorities' " or " 'communication of the abandonment' " of the criminal enterprise). As the district court found, Garrett's so-called withdrawal "came *only* after he satisfied himself that his active participation was no longer required to assure" the success of the criminal venture. 545 F.Supp. at 136 (emphasis in original). Under the law, there was no abandonment of the criminal enterprise.

The convictions of Timothy M. McNamara and Philip H. Garrett are

*Affirmed.*