865 F.2d 1330
 275 U.S.App.D.C. 231
 Unpublished Disposition
NOTICE: D.C. Circuit Local Rule 11(c) states that unpublished orders, judgments, and explanatory memoranda may not be cited as precedents, but counsel may refer to unpublished dispositions when the binding or preclusive effect of the disposition, rather than its quality as precedent, is relevant.
John STONE, Appellant,
v.
INTERNATIONAL BROTHERHOOD OF TEAMSTERS, CHAUFFEURS,
WAREHOUSEMEN & HELPERS OF AMERICA, et al., Appellees.
And Consolidated Cases Nos. 88-7005 and 88-7053
 No. 87-7216.
 United States Court of Appeals, District of Columbia Circuit.
 Dec. 30, 1988.
 
 Before WALD, Chief Judge, and HARRY T. EDWARDS and D.H. GINSBURG, Circuit Judges.
 JUDGMENT
 PER CURIAM.
 
 
 1
 This case was considered on the record on appeal from the United States District Court for the District of Columbia and was briefed by the parties and argued orally by counsel. The issues have been accorded full consideration by the court and occasion no need for a published opinion. See D.C.Cir. Rule 14(c). For the reasons stated in the accompanying memorandum, it is
 
 
 2
 ORDERED and ADJUDGED that the orders of the district court dated July 30, 1987, October 8, 1987, November 30, 1987, and January 13, 1988, respectively limiting discovery, granting partial summary judgment in favor of defendants, directing a verdict in favor of defendants, and awarding sanctions against plaintiff's counsel under Fed.R.Civ.P. 11, be affirmed.
 
 
 3
 The clerk is directed to withhold issuance of the mandate herein until seven days after the disposition of any timely petition for rehearing. See D.C.Cir.Rule 15.
 
 MEMORANDUM
 
 4
 Plaintiff John Stone appeals from various orders of the district court (Gesell, J.) entered in the course of this suit challenging his firing by defendants International Brotherhood of Teamsters, Chauffeurs, Warehousemen & Helpers of America, and the general president thereof, Jackie Presser (collectively, IBT). Judge Gesell's orders: (1) limited Stone's attempt to pursue certain avenues of discovery; (2) granted summary judgment in favor of Presser on Stone's claim that his firing had been in violation of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. Sec. 1961, et seq. (1982 and Supp.1988) (RICO), and in favor of the IBT on Stone's public policy claim; (3) granted the IBT's motion for a directed verdict on Stone's claim that his firing was in breach of his employment contract; and (4) granted the IBT's motion for sanctions against Stone's attorney based upon his refusal to withdraw the RICO and public policy claims after it allegedly became clear that those claims were without a sufficient factual grounding. We affirm.
 
 I. Want of a Cross-Appeal
 
 5
 Before proceeding to an examination of each of the separate claims, we first address a procedural argument raised by Stone. A number of the arguments raised by the IBT before this court as grounds for affirming the district court's grant of summary judgment on the RICO and public policy claims and of a directed verdict on the breach of contract claim were originally urged before the district court in various motions to dismiss, all of which the district court denied. Stone contends that the IBT's failure to cross-appeal the court's rulings on these motions bars the IBT from relying before this court on any arguments presented in the motions. This point is not well taken.
 
 
 6
 As Stone recognizes, this court may affirm a decision of the district court if it is correct regardless of whether the district court relied on an incorrect ground in making its ruling. See, e.g., United States v. Garrett, 720 F.2d 705, 710 (D.C.Cir.1983). Stone claims, however, that the general rule is inapplicable here under Grimes v. District of Columbia, 836 F.2d 647 (D.C.Cir.1988). In Grimes, the plaintiff won a money judgment in the district court and appealed, arguing that the amount had been improperly calculated. The defendant did not cross-appeal, but urged as a ground for affirming the district court's determination of damages that the defendant was not liable for any damages at all. This court refused to consider the argument, stating that where the rationale of the argument upon which the appellee sought to rely would suggest reversal rather than affirmance, that argument could not be raised as a ground on which to affirm absent a cross-appeal. 836 F.2d at 651.
 
 
 7
 Stone attempts to apply Grimes to this case with the claim that if this court affirms the district court on an issue raised in the motions to dismiss, the IBT will "arguably" be entitled to go back to the district court to request sanctions, per Rule 11, for the filing of those motions. Thus, argues Stone, to affirm on a ground raised in the motion to dismiss would be to modify substantially the judgment below rather than merely to affirm it.
 
 
 8
 Accepting Stone's factual premise for the purposes of argument, his theory still fails. Although Stone seeks to emphasize (out of context) the statement in Grimes that a cross-appeal must be taken where the argument sought to be raised would entitle a party to "more than [affirmance]," 836 F.2d at 651 (emphasis in original) (citations omitted), the rationale of Grimes is that a party cannot, as a ground for affirmance, rely on an argument the logic of which dictates reversal; rather, the party must take a cross-appeal. Here, the logic of the arguments raised by the IBT dictate affirmance. Grimes is therefore irrelevant.
 
 II. RICO
 
 9
 Section 1964(c) of 18 U.S.C. provides that "[a]ny person injured in his business or property by reason of a violation of [RICO] may sue therefor...." The Supreme Court interpreted this language in Sedima, S.P.R.L. v. Imrex, 473 U.S. 479, 496 (1985) to mean that "the plaintiff only has standing if, and can only recover to the extent that, he has been injured in his business or property by the conduct constituting the violation." In order to have standing to raise the RICO claim, then, Stone must present evidence to show that he was injured by some aspect of the pattern of racketeering activity he alleged.
 
 
 10
 The alleged pattern was a scheme to award printing contracts to one Thomas Crowell, a long-time friend of Presser, at above-market rates (and, inferentially, for Crowell to pay kickbacks or otherwise to compensate Presser in return). As an initial matter, it is clear that Stone was not injured by the scheme, narrowly conceived. He has not been a member of the IBT since 1961 and therefore cannot have suffered financial loss from the excessive payments themselves. Apparently recognizing this, Stone seeks to connect his discharge to the alleged scheme by charging that his firing was in furtherance of the scheme.
 
 
 11
 Stone's allegation, however, is belied by his own deposition testimony. Stone there suggested various reasons why Presser might have fired him: first, the (assertedly untrue) rumor that Stone had campaigned against Presser's bid for the general presidency; and second, Stone's interest in a company (Delancey Printing) that had done printing for the IBT and that would be displaced by the company for which Crowell worked, combined with Presser's misapprehension that Stone "was getting a lot of money from Delancey Printing...." Neither of these possible reasons had any apparent connection to the alleged racketeering activity. Even if the latter reason would have given Stone an incentive to challenge the contracts with Crowell, that incentive alone is not evidence that Presser fired him because he could be expected to challenge the contracts.
 
 
 12
 Finally, after giving those two reasons in response to the question, "Why do you believe you were fired?" Stone, when prompted by leading questions, finally alluded to the alleged printing contract scheme:
 
 
 13
 Q. Do you believe you were fired or do you have any information you were fired so as to enable Mr. Presser to be able to award the printing contract to the company that was affiliated with Mr. Crowell?
 
 
 14
 * * *
 
 
 15
 * * *
 
 
 16
 The witness: I don't think I was fired for that reason because whether or not he was going to fire me, he can give the thing [contract] to whoever [sic] he wants to give it to.
 
 By [IBT's counsel]:
 
 17
 Q. He didn't need permission, he could give it to whoever [sic] did the printing?
 
 
 18
 A. He didn't have to check with me.
 
 
 19
 * * *
 
 
 20
 * * *
 
 
 21
 Q. Okay. Did the effect of your firing make it more likely that printing contracts with the IBT obtained through competitive bidding would be cancelled?
 
 
 22
 A. I answered that earlier that he didn't need my permission.
 
 
 23
 Q. Right. Did the fact that you were no longer an IBT employee make it more likely that the IBT would enter into a much more costly non-competitive bid contract for printing with Crowell?
 
 
 24
 A. Well, I would say Crowell would influence him in getting rid of me because I would question Crowell at times. I would say Tommy, this is way up and I don't have anything in writing to say why these prices went up. But if I left there wouldn't be nobody to check it or have the knowledge of knowing.
 
 
 25
 In the first three exchanges, Stone denied that his firing was in any way associated with Presser's alleged scheme, and although the last exchange may on its face seem to contradict the previous three, examined more closely, it is consistent with them. The final exchange concerns not printing contracts pursuant to the alleged scheme, but earlier contracts between the IBT and a printing company with which Crowell had been associated before Presser was elevated to the general presidency. Seen in context, the final exchange merely alleges that Presser might have fired Stone to please Presser's old crony Crowell; it does not contradict the earlier repeated statements that Presser (the only defendant to the RICO count), did not fire Stone in furtherance of the RICO scheme, because Stone's presence on the job would not affect the success of the scheme one way or the other.
 
 
 26
 Stone has presented various possible bases for his firing, some of which appear quite improper; none of them, however, implicate the alleged RICO scheme, and Stone therefore lacks standing to assert that the printing scheme violates RICO.
 
 III. Public Policy
 
 27
 As goes the RICO claim, so goes the public policy claim. Whatever the reason for Stone's firing, his deposition testimony is that it was not to facilitate the allegedly illegal scheme to award above-market printing contracts to Crowell. His public policy cause of action rests entirely on the theory that his termination was part of the scheme to defraud the union. Because, as discussed above, Stone's own deposition testimony establishes that his firing was not part of the alleged scheme, his public policy argument must also fall. In so holding, we express no opinion on whether a cause of action for discharge in violation of public policy would be recognized under the law of the District of Columbia.
 
 IV. Discovery
 
 28
 Stone raises two separate questions concerning the orders limiting discovery. First, Stone's request that Presser produce certain documents at the latter's deposition included a number of documents regarding what Stone alleges are possible schemes other than the printing contract scheme in which Presser allegedly was involved. Stone claims that the district court's grant of the protective order as to these documents was an abuse of discretion. Second, Stone makes the same objection to Judge Gesell's order allowing him to depose Presser after the initially set June 30 deadline for only four additional hours.
 
 
 29
 A district judge's discretion to manage the discovery process is broad indeed. In this case, we need not decide whether that discretion was abused in limiting document production, however, because as we have seen, Stone was without standing to make his RICO claim, and nothing in the limitation on discovery even arguably affected his standing. Thus, even if the requested document discovery was relevant to the existence of the alleged pattern of racketeering activity, proof of that pattern would be insufficient to establish liability in this case. The documents concerned matters other than Stone's firing, and Stone does not contend that the documents would have provided what is lacking in his case--any link between Stone's firing and the alleged pattern. The protective order therefore had no effect on the result of this action.
 
 
 30
 As to the deposition, it could conceivably have provided evidence relevant to Stone's claim that he was fired to further the printing scheme. The court's order was well within its discretion, however. As Judge Gesell described the initial deposition,
 
 
 31
 The attempted Presser deposition was a fiasco. Plaintiff was unable or unwilling to address issues with any precision or directness and defendant Presser reneged on his agreement with plaintiff's counsel, announcing he was terminating the proceeding prematurely. Much of the time was devoted to bickering and posturing between counsel. Both counsel were at fault.
 
 
 32
 It is apparent from the transcript that Judge Gesell was not the least bit unfair in his description. In addition, Stone does not even contend that he was prejudiced by having "only" four more hours to complete his deposition. In short, the district judge did not abuse his discretion in limiting Presser's deposition.
 
 
 33
 Finally, Stone's claim that he should have had the opportunity for follow-up discovery after completing Presser's deposition is without merit. Judge Gesell thrice, on Stone's motion, enlarged the time within which Stone might depose Presser and within which Stone was required to respond to the motion for summary judgment. Especially in light of its finding that Stone's earlier discovery efforts had been rife with irrelevancies and "posturing," the court's refusal to extend the deadlines a fourth time was well within its discretion in controlling discovery. Moreover, the court had terminated all discovery other than Presser's deposition by order of March 31, 1987. Insofar as Stone challenges that order, this court is without jurisdiction to hear the challenge because Stone has not appealed the relevant order.
 
 IV. Breach of Contract
 
 34
 The district court granted the directed verdict on Stone's breach of contract count on alternative grounds: the court held both that Stone had failed, as a matter of law, to rebut the presumption that employment contracts are at-will, see, e.g., Minihan v. American Pharmaceutical Association, 812 F.2d 726, 728 (D.C.Cir.1987), and that the contract fell within the statute of frauds.
 
 
 35
 The court erred in holding that the contract fell within the statute of frauds. In Hodge v. Evans Financial Corp., 823 F.2d 559 (D.C.Cir.1987) (Hodge III ), this court held that a contract for lifetime employment does not fall within the statute of frauds. After quoting multitudinous authorities to the effect that any possibility, no matter how remote, that a contract may be completed within a year takes the contract out of the ambit of the statute of frauds, 823 F.2d 561-62, we held that the possibility that the plaintiff might die within the year takes his lifetime employment contract out of the statute.
 
 
 36
 There is nothing to distinguish the lifetime contract in Hodge III from the contract "until you choose to retire" alleged here. Stone might choose to retire at any time. He might not be entitled to pension benefits should he retire before a particular date, but that does not mean that he could not have retired immediately after the promise was made.
 
 
 37
 The IBT responds that Stone testified on cross examination that, at the time the promise was made, he planned to retire in 1990, after he had served 30 years with the IBT. Thus, the IBT argues that Stone was not going to retire within a year and did not retire within a year, and that his contract therefore falls within the statute of frauds. This argument is foreclosed by Hodge III. As Chief Judge Wald there wrote, "[T]he enforceability of a contract under the statute does not depend on the actual course of subsequent events or on the expectations of the parties. Instead, the statute applies only to those contracts whose performance could not possibly or conceivably be completed within one year." 823 F.2d at 561 (emphasis added). The district court therefore erred insofar as it relied on the statute of frauds for its directed verdict on the breach of contract claim.
 
 
 38
 The district court's alternative ground is sound, however. We affirm its directed verdict for the other reason Judge Gesell gave in granting it.
 
 VI. Sanctions
 
 39
 As to the sanctions order, it should have been apparent to counsel after Stone's deposition that Stone had no standing to raise the RICO claim and that he had not stated a claim in his public policy allegation. If the deposition was not enough, the letter from the IBT's counsel setting forth in detail the relevant portions of the deposition should surely have been sufficient. The sanctions order is therefore affirmed.